**UNITED STATES of America, Plaintiff,**

v.

**John Andrew STURM, Defendant.**

**Crim. A. No. 86–421–WD.**

United States District Court,
D. Massachusetts.

Sept. 8, 1987.

Charles McGinty, Federal Defender's Office, Boston, Mass., for defendant.

Paul F. Healy, Asst. U.S. Atty., for plaintiff.

## MEMORANDUM UPON ENTRY OF JUDGMENT

WOODLOCK, District Judge.

This is a repossession dispute which ripened into a criminal proceeding.

I denied the defendant's "Motion for Judgment of Acquittal," after a jury verdict finding him guilty on Count One of attempted extortion under the Hobbs Act, 18 U.S.C. § 1951, and guilty on Count Two of violation of the bank felony statute, 18 U.S.C. § 2113(a). The principal question raised by that motion was whether the jury could properly conclude that the defendant's lender, the Worcester County Institute for Savings ("WCIS" or "Bank"), was put in fear of economic harm during its negotiations with the defendant over the return of certain collateral related to his purchase of an airplane.

I am directing judgment on this conviction which includes a term of incarceration and a fine as punishment for that activity but does not include an order of restitution. The principal question presented by the sentencing decision was how to calibrate and sanction the blameworthiness of the defendant's conduct in his negotiations with WCIS.

This memorandum is intended to set forth the interrelated reasons for the answers I have given to these questions.

### I

The facts taken—as they must be on this Motion for Judgment of Acquittal—in the light most favorable to the Government, *United States v. McNatt*, 813 F.2d 499, 502 (1st Cir.1987), showed the following at trial.

The defendant John Andrew Sturm obtained a loan from WCIS by signing a promissory note for $110,000 in May 1985 and giving a purchase money mortgage in connection with his acquisition of an Aero Commander aircraft for $214,000. The loan was secured by the aircraft and certain related materials including the plane's logbooks.

Logbooks, which in essence provide a history of the aircraft, are necessary if the aircraft is to be used for commercial purposes and are inherently valuable to potential purchasers as evidence of the past performance of the aircraft.

In May 1986, Sturm was late on his payments to WCIS. Upon inquiry from the Bank, Sturm promised to bring the note up to date, which he did shortly thereafter. The following month WCIS learned from People's Bank in Connecticut that People's Bank had experienced problems with Sturm in connection with their own loan on another aircraft purchased by him. People's Bank indicated that it was considering filing a mechanic's lien against the Aero Commander—which was then kept in an airport in Connecticut. On the basis of this information, WCIS repossessed the Aero Commander. WCIS's act of repossession, however, did not encompass the logbooks.

The aircraft was flown from Connecticut to Hyannis, Massachusetts, on August 20, 1986. On September 26, 1986, an auction was held to sell the Aero Commander. Sturm appeared at the auction with an associate, who bid $50,000 for the aircraft. The Bank took ownership of the plane because the auction did not produce what WCIS considered the fair market value for the aircraft. Bank officials learned that the low valuation was a result of the unavailability of the logbooks.

After the auction Sturm told WCIS officials that he might be able to obtain the logbooks for a fee. In a series of telephone conversations Sturm inquired about the Bank's success in selling the airplane and indicated that he might sell the logbooks either to WCIS or to the ultimate purchaser of the aircraft.

Following one such telephone call WCIS contacted the FBI and the subsequent conversations were recorded. During a telephone conversation on December 2, 1986, Sturm professed to be unable to find the logbooks and offered to broker the aircraft

for WCIS. Exhibit 5A at 3.[1] After discussing the two potential buyers with whom WCIS was then purportedly in negotiations, Sturm noted that with the logbooks the aircraft would be worth "more than forty five thousand dollars more" than was being offered. He then pressed his proposition. "That should make the books worth about twenty thousand dollars," Sturm said. *Id.* WCIS's representative interjected, "for the Bank to give to you?" "Yeah," Sturm replied. He continued, "for twenty thousand dollars I know I could find the books. I can find anything." *Id.* at 9.

Sturm explained that he was not concerned about any residual indebtedness to the Bank on the loan. "[I]t doesn't matter to me whether they, whether the Bank wants to chase me or whether, cause I've already named them in my bankruptcy filing anyways ...," he explained. *Id.* at 10. Sturm said he would, however, be able to deliver the books if the Bank could assure him that he would receive $20,000. "[Y]ou get a commitment for me and then I can give you a commitment, then there'd be no problem." *Id.* at 15–16. In a conversation later that day, Sturm reiterated his offer. "If they want to pay twenty thousand, I can have the books by the end of the week for em." Exhibit 6A at 9.

During that conversation, Sturm told the Bank that he expected to have his loan balance liquidated and to receive $20,000 additional cash.

> I wanna be able to walk out of this thing and also I would want it in cash, cash, too. So that I won't have any problems with someone saying well yeah we'll give you twenty thousand and apply it against your loan. I don't want any of that crap.

*Id.* Sturm explained that he wanted the cash to avoid creditors.

> I don't want to have money that's attachable, and you know, like if I accepted a check from you people, you could put a stop payment on it.... And cash I can

spend you know and I can say hey, I spent it the next and there's no problem with it. I just don't want any ah ah people saying, well you know, what happened to that money. I can say, well I grabbed it and I spent it.

*Id.* at 11. After further negotiations, WCIS agreed to pay $20,000 to get the books. *Id.* at 15. Two days later, Sturm called to confirm that he had the logbooks and that the books would be transferred the following day, December 5. Exhibit 7A at 1–2.

On December 5, Sturm met in the Bank with two FBI agents working in an undercover capacity as officers of WCIS. Sturm told them he retrieved the logbooks from the Cayman Islands and brought them to Worcester from his home in Connecticut. Exhibit 9A at 3, 13. He said the logbooks, to which he had had access for some time, were in the parking lot ready for transfer. *Id.* at 9, 15. Sturm reiterated his demand for cash and expressed concern about preparation of a Currency Transaction Report because he did not want to attract the IRS's attention to his receipt of cash. "I don't want to raise any flags. I want to keep this thing as private and confidential as possible," he said. *Id.* at 8. When one of the Agents observed, "this kinda reminds me of a kidnapping or whatever. You know, we, we take twenty thousand dollars out and see our property," *id.* at 14–16, Sturm replied, "I know." *Id.* at 15.

Sturm then left the Bank with the two agents and was arrested as he showed them the logbooks in the trunk of his car.

## II

The Hobbs Act, 18 U.S.C. § 1951(b)(2), recognizes three species of inducement which can lead to extortionate interference with interstate commerce: wrongful use of actual or threatened force or violence; the color of official right; and fear, which in practice—when unassociated with force, violence or misuse of public office—has come generally to mean fear of economic harm.

---

**1.** Quotations from conversations are drawn from the transcripts of the tape recordings. These transcripts, to which no objection regarding accuracy was made, were marked for identification at trial and used as listening aids by the jury.

In its last major treatment of the Hobbs Act the Supreme Court attempted to place a limiting construction on the scope of the statute. The Court held that the word " 'wrongful' has meaning in the Act only if it limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." *United States v. Enmons,* 410 U.S. 396, 400, 93 S.Ct. 1007, 1009–10, 35 L.Ed.2d 379 (1973).

Since *Enmons,* however, the lower courts, no doubt concerned that acts of force and violence seeking an extortionate extraction "deserve to be dignified as federal crimes," *id.* at 412, 93 S.Ct. at 1016 (Blackmun, J., concurring), have systematically chosen to limit *Enmons.* Indeed, its holding has been characterized as "merely carv[ing] out a labor exception to the traditional law of extortion codified in the Hobbs Act." *United States v. Zappola,* 677 F.2d 264, 269 (2d Cir.), *cert. denied,* 459 U.S. 866, 103 S.Ct. 145, 74 L.Ed.2d 122 (1982).

Putting to one side whether the development of Hobbs Act case law in the inferior courts after *Enmons* has faithfully read and applied what the implications of that decision were for violence or misuse of office cases, *cf. United States v. Russo,* 708 F.2d 209, 216–26 (6th Cir.) (Holschuh, J. concurring), *cert. denied,* 464 U.S. 993, 104 S.Ct. 487, 78 L.Ed.2d 682 (1983) the post-*Enmons* case law rejecting the claim of right defense has not yet spoken directly in the context of fear of economic harm.[2] And this is a context in which reasoned differential analysis is quite important.

The desire to recognize wrongfulness in cases involving violence or misuse of position is intuitively apparent. The use or threatened use of force and violence and the misuse of office are not difficult to recognize as inherently wrongful means to any end. But the same presumptive wrongfulness does not arise where the activity is not inherently wrong but is designed to instill anxiety that some economic benefit or interest may be lost. That anxiety is after all the animating force of our economic system.

Consequently, the concept of wrongful inducement of fear of economic harm requires a careful effort at definition lest the push and shove of the market place lead capriciously to criminal sanction.

The relevant distinctions are less than fully articulated in the case law. In a recent and extended discussion of the is-

---

**2.** Marshalling the lower court case law since *Enmons,* the Government has contended throughout this proceeding that there is no such thing as a claim of right defense to a Hobbs Act prosecution unrelated to labor disputes. The Government's position finds support in the language of some post-*Enmons* cases. But on closer analysis it appears that each of the cases to which the Government cites involved some degree of violence or force; the misuse of office or position for personal gain; or a pretextual claim of right. None could be characterized as a pure fear of economic harm case. *See generally, United States v. Agnes,* 753 F.2d 293, 296–97, 302 (3d Cir.1985) (claim of right rejected when business partner used threats of force and actual violence in seeking property arguably his under state law); *United States v. Russo,* 708 F.2d at 214–15 (claim of right rejected when employees were induced to agree to a service charge taken from gross earnings in a setting where jury was permitted to consider proof of Mafia association of alleged extortionists as creating fear of economic loss); *United States v. Zappola,* 677 F.2d at 269–70 (claim of right not applicable "where two businessmen beat and threatened a third businessman to coerce pay-

ment of an alleged debt."); *United States v. Porcaro,* 648 F.2d 753, 760 (1st Cir.1981) (finding "no basis for extending *Enmons* to protect from Hobbs Act prosecution the use of force and threats to resolve a contractual dispute among businessmen" in a setting suggesting a pretextual claim of right); *United States v. French,* 628 F.2d 1069, 1074–75 (8th Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980) (defendant "obtained a wrongful payment for himself under color of office"); *United States v. Cerilli,* 603 F.2d 415, 418–19 (3d Cir. 1979), *cert. denied,* 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980) (state employees misused office when they made political contributions a condition to doing lease business with state agency); *United States v. Warledo,* 557 F.2d 721, 729–30 (10th Cir.1977) (Indian defendants shown to have used violence and threats of violence to coerce railroad to payoff for arguably inapplicable claim of right to tribal lands); *United States v. Quinn,* 514 F.2d 1250, 1257–59 (5th Cir.1975), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976) (payment to end picketing was determined to be personal payoff to promoter of picketing).

sue, the Second Circuit *en banc* found, for example, that its "case law on extortion by wrongful use of fear of economic loss is comprised of cases in which the evidence was plain that nonpayment would result in preclusion from or diminished opportunity for some existing or potential economic benefit." *United States v. Capo*, 817 F.2d 947, 951 (2d Cir.1987) (*en banc*).[3] The First Circuit has taken a broad view of the benefits protected but concluded that "hypertechnical" inquiry "into the kind of economic interest at stake is of little significance except as it may indicate that the victim had no grounds for fear."*United States v. Hathaway*, 534 F.2d 386, 395–96 n. 6 (1st Cir.), *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976).

With respect, however, I do not find these articulations to be altogether helpful in deciding when "preclusion" or "diminished opportunity" in the economic arena justifies invocation of the federal criminal sanction. Close analysis of the economic benefits, claims or rights is, I think, quite significant as the starting point for reasoned analysis of the fear of economic harm species of wrongful inducement. As will appear more fully below, I have concluded after some extended reflection that defendant's claim of right must be analyzed separately from his ability to instill fear in order properly to evaluate the evidence in a case brought purely as a fear of economic harm Hobbs Act prosecution.

–A–

As the Government conceded in *Enmons*, 410 U.S. at 399–400 n. 3, 93 S.Ct. at 1009 n. 3, the defendant's claim of legitimate right in the context of fear of economic harm is, where the activity does not involve inherently wrongful means, of distinctive importance as a limiting principle. This is because, as was recognized by even the panel majority in *Capo*—whose broad view of the Hobbs Act was ultimately rejected *en banc*—"[w]hat the [Hobbs] Act reaches is not mere hard bargaining but the exploitation of the fear of economic loss in order to obtain property *to which the exploiter is not entitled.*" *United States v. Capo*, 791 F.2d 1054, 1062–63 (2d Cir.1986) (emphasis supplied).[4]

In *United States v. Clemente*, 640 F.2d 1069, 1077 (2d Cir.) *cert. denied*, 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981), the Second Circuit identified the essence of wrongfulness as "the use of fear of economic loss to obtain property to which one is not entitled." The court found it necessary to examine both the means and the ends of the defendant in the context of economic harm.

It is obvious that the use of fear of financial injury is not inherently wrongful. And precisely because of this fact,

---

3. The Second Circuit broke the fear of economic harm cases down into a somewhat more detailed typology in *United States v. Brecht*, 540 F.2d 45 (2d Cir.1976), *cert. denied*, 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977). The types identified in *Brecht* were cases involving (1) "the use by corrupt labor union officials of their power to order picketing or strikes to exact money from employers for their own benefit;" (2) "the use of power by public officials, from mayors to policemen, to shake down persons by refusing them the right to do business unless they pay tribute;" and (3) "not the extortion of money per se, but rather the classic racketeering activity of preventing 'outside' businessmen from taking over accounts 'belonging' to the extorters or their cohorts." *Id.* at 51. *Brecht* was viewed as still another type involving use of economic fear by a private purchasing agent in a commercial bribery setting analogous to the use of fear established "by proof of threats made by the defendants that certain bidders would not be awarded city contracts if they failed to pay the customary kickbacks to city officials." *Id.* at 52. It should be noted that *Brecht*'s separate holding that commercial bribery could not be prosecuted separately under the Travel Act, *id.* at 48–50, was later rejected by the Supreme Court. *See Perrin v. United States*, 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979).

4. I recognize the anomaly that by adopting the claim of right distinction in the fear of economic harm context—although it apparently is not accepted outside the labor area in violence cases—I am adopting the "convoluted construction of wrongful" scorned as redundant by the majority in *United States v. Enmons*, 410 U.S. at 400 n. 3, 93 S.Ct. at 1009 n. 3. The case law, however, leaves me no alternative but to embrace this anomaly in order to foster the claim of right distinction in the economic harm context against the rejection it has received among other species of wrongful inducement.

the "objective" of the party employing fear of economic loss will have a bearing on the lawfulness of its use.... Fear of economic loss is not an inherently wrongful means; however, when employed to achieve a wrongful purpose, its "use" is wrongful.

*Id.* The *Clemente* court found that it was:

clear that a wrongful purpose, obtaining money to which they have no lawful claim, was the aim of the defendants. Thus the utilization of fear of economic loss to achieve that goal was wrongful. This being the case, the wrongful means and wrongful use elements of the crime of extortion were met.

*Id.* at 1078. *Clemente*'s analysis of means and objectives brings into focus for this case the First Circuit's observation that "inquiry into the kind of economic interest at stake ... [may be indicative of whether] the victim had ... grounds for fear." *United States v. Hathaway,* 534 F.2d at 395–96 n. 6.

■ What appears to be a necessary, if not sufficient, condition to bring fear of economic loss within the proscriptions of the Hobbs Act is the defendant's lack of legitimate claim to receive payment or benefit for the property or service he is offering. This lack of legitimate claim may be because a person in his position cannot rightfully claim a personal benefit for performing his function. *See, e.g., United States v. Gibson,* 726 F.2d 869, 873 n. 2 (1st Cir.), *cert. denied,* 466 U.S. 960, 104 S.Ct. 2174, 80 L.Ed.2d 557 (1984) (instruction that "Hobbs Act forbids, if other essential elements are proved, officials taking money for their own purposes, that is, lining their own pockets in order to preserve labor

peace" held correct); *United States v. Brecht,* 540 F.2d 45 (purchasing agent violated Hobbs Act by obtaining kickback as condition of award of contract). The lack of legitimate claim may also be shown when the defendant seeks payment for some economic benefit which is not rightfully his to confer or for forebearance from adverse economic consequence which is not rightfully his to visit on the victim. *United States v. Clemente,* 640 F.2d 1069 (waterfront figure violated Hobbs Act in scheme to "protect" victim's accounts from loss or disruption); *United States v. Rastelli,* 551 F.2d 902 (2nd Cir.), *cert. denied,* 434 U.S. 831, 98 S.Ct. 115, 54 L.Ed.2d 91 (1977) (trade association extorted monies from suppliers of members of industry). However, irrespective of the manner in which the various fear of economic harm cases are characterized, the common theme is that the defendant sought concessions for economic activity which he had no legitimate right to undertake.

■ The first order of business then is to determine what interest, if any, Sturm had in the property concerning which he was bargaining with WCIS. The logbooks were collateral for his loan with WCIS. Although the respective rights of Sturm as borrower and WCIS as lender are for these purposes a matter of state law, it is Sturm's attempt to re-negotiate the terms of the loan through threats of loss of the collateral which causes his actions to fall within the federal proscriptions of the Hobbs Act.

At trial the defendant expended considerable effort in disputing WCIS's possessory right to the logbook collateral.[5] That dis-

5. The relation between Sturm and WCIS appears to be governed by Mass.Gen.L. ch. 255, § 13I which imposes a restrictive regime upon a lender such as WCIS making a loan in connection with a consumer credit transaction, which is secured by a nonpossessory security interest in the goods. There was some uncertainty between the parties about what the governing Massachusetts law was in connection with Sturm's purchase of the Aero Commander. In his initial Motion for Judgment of Acquittal, Sturm contended that the Retail Installment Sales Act, Mass.Gen.L. ch. 255D, § 21 *et seq.* was applicable. The Court rejected the statute as

irrelevant to the Aero Commander loan and suggested Ch. 255, § 13I governed. Both parties thereafter conceded that § 13I was the relevant Massachusetts governing law. Section 13I requires an elaborate formal scheme of notice of default with opportunities to cure.

Massachusetts contract case law also imposes restrictions on the rights of a lender. A lender may exercise its statutory power to foreclose on its security interest only to the extent of the contract between the parties. *See generally Mechanics National Bank of Worcester v. Killeen,* 377 Mass. 100, 107–108, 384 N.E.2d 1231 (1979).

pute was not, however, dispositive of the issue whether Sturm had a legitimate right to threaten unavailability of the collateral, the context in which this criminal investigation was initiated and charges brought. The Bank's failure to follow proper procedures in repossessing the aircraft would in no way eliminate its security interest in the logbooks, or enlarge Sturm's rights to the extent that he was free to extract additional funds—beyond those already provided as part of his loan transaction—by a new promise of safe return for the Bank's collateral.[6]

To be sure, the respective rights and duties of lender and debtor in property subject to a security interest create what Professor Gilmore has accurately described as a "not uncomplicated relationship." 2 G. Gilmore, *Security Interests in Personal Property*, 1128 (1965). We should not be distracted, however, by the irrelevant strands of this relationship presented in the possessory aspects of the secured party's role as "less than an owner and more than a mere custodian...." *Id.* at 1075. Rather the focus must be on the character of the security interest itself.[7] That focus discloses an inversion of relative security

rights here. For Professor Gilmore there was "[n]o doubt a security interest in personal property would support an action for relief against the debtor's improper use or maintenance of the security," although he was of the view that "that is a merely theoretical possibility."

*Id.*, at 1191. We face in this case, however, a practical actuality in which the debtor has sought to transform his improper maintenance of the security interest into a wrongful source of profit. A series of hypotheticals can be constructed for illustrative purposes.

If we assume that the security agreement between Sturm and WCIS did not include the logbooks, then Sturm's proposition would not take on the character of anything other than hard bargaining. He would be offering property to which he held complete title and interest. The property, of course, would have an independent value to WCIS and WCIS could legitimately be expected to pay for it in order to make the collateral, for which it had bargained previously, more valuable. This, it seems to me, would be an unsanctionable economic transaction.

There is a significant question whether the Bank's purported repossession was faulty. The contract between the parties provided for only one event of default—the failure to pay on a timely basis as required under the contract. The Government conceded it could not argue that a default of this type occurred because the Bank's repossession was undertaken without effective notice and opportunity to cure the nonpayment. The Government contended instead that Sturm had breached certain warranties regarding protection of the title from liens.

Although the jury was instructed to determine whether any of these warranties were breached and if so, whether such breaches constituted a substantial impairment of value giving rise to a right of foreclosure, I conclude on reflection that the contract between the parties made the Bank's foreclosure on the Aero Commander—and *mutatis mutandis* would have made foreclosure on the logbooks—questionable because of the bank's failure to lay the basis for a default which would justify foreclosure.

6. It is important to identify the "property from another" which Sturm has been found to attempt to obtain wrongfully.

At first glance, there appear to be two possible candidates: the logbooks and the Bank's $20,-000 offer for their return. It is the $20,000,

however, which fits the precise statutory meaning of "property" in this case. Although there is established by the bargaining between WCIS and Sturm an economic equivalence between the logbooks and the $20,000, it is the $20,000 that Sturm sought to obtain wrongfully. At issue is not whether Sturm had a cognizable interest in the logbooks; we may assume that he did—as did the Bank. Rather the issue is whether he used fear in order to obtain other property—the $20,000—in which he had no lawful interest.

7. I recognize that the Model Penal Code excludes security interests from the definition of "property of another" subject to extortionate demand. *See generally* ALI, Model Penal Code § 223.0(7) (definition); § 223.4 (Theft by Extortion) (Official Draft and Revised Comments 1980). This definition, however, is a drafting device designed to treat a debtor's fraudulent disposition of encumbered property specifically. *Id.* at § 223.2 (comment) at 171; § 224.10. It does not reflect any diminished importance in security interests as property. However, because the Model Penal Code treats fraudulent disposition of encumbered property as a misdemeanor, it does suggest that some adjustment is appropriate for purposes of establishing an appropriate sanction. *See generally* Section IV.A. *infra*.

By contrast if we assume in these circumstances—where the parties had identified the logbooks as collateral—that Sturm were to propose to WCIS that he would burn the logbooks if the Bank did not provide him with a payment, it would not be difficult to recognize that proposition to be extortion. Physical harm or the threat of physical harm to property in which a victim has an interest is a long standing concern of the law of extortion. Fear of such harm is undoubtedly a core concern of the fear of economic harm species of wrongful inducement under the Hobbs Act.

Here the proposition is more sophisticated. Sturm does not propose to destroy the collateral, he merely proposes not to use his efforts to locate it. But threatening to impair the availability of the collateral by making its whereabouts unknown unless paid an additional sum is no less extortion than destroying the collateral itself. Sturm has no claim to make WCIS pay more for the collateral than it already has agreed to in its initial negotiations with him over the terms and conditions of the loan. Sturm offered WCIS nothing it was not already entitled to under its prior agreement with him: access to the collateral in which it maintained a security interest.[8]

■ Once a defendant offers a victim the "opportunity"—on pains of suffering a financial detriment or foregoing a financial benefit—to obtain for further consideration that to which the victim is already entitled, the predicate lack of legitimate claim of right necessary to establish fear of economic loss sanctionable under the Hobbs Act has been laid.

Having concluded the Government's proof satisfied this necessary condition, I may now address the question whether Sturm's dealings with property not entirely his and his seeking of payment to which he was not entitled could fairly be said to have induced fear in WCIS.

—B—

■ The most recent synthesis of the cases has sought to define the reasonableness of the victim's fear by determining whether the defendant threatened "that nonpayment would result in preclusion from or diminished opportunity for some existing or potential economic benefit." *United States v. Capo*, 817 F.2d at 951. But, as noted in subsection II.A. *supra*, "preclusion" or "diminished opportunity"—which are among the unhappy facts of life in the economic arena—cannot stand alone as a violation of the Hobbs Act on a fear of economic harm theory without the foundation of an illegitimate claim of right. Nor would preclusion or diminished opportunity in the abstract necessarily prove fear. Preclusion is, however, significant evidence that the victim's fear was reasonable, and that the payments made or proffered were compulsory, rather than a voluntary selection of legitimate commercial alternatives. *See United States v. Sander*, 615 F.2d 215, 218 (5th Cir.1980), *cert. denied*, 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980) (government satisfies "its burden of proof if it show(s) circumstances surrounding the alleged extortionate conduct that rendered the victim's fear of threatened loss reasonable.").

■ In contrast to the discussion above concerning the defendant's claim of right, it is not necessary that the victim have an immediately protectable property interest in the benefit or opportunity sought. "Fear of economic loss is sufficient to constitute extortion ... even if the interest threatened is only an anticipated one." *United States v. Rabbitt*, 583 F.2d 1014, 1027 (8th Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *United States v. Hathaway*, 534 F.2d at 394. The Government does not have to show that the "fear was a direct conse-

---

**8.** It has been suggested that Sturm did have additional consideration to offer for the payment he sought. This would presumably be something in the nature of finders' services for the collateral and forebearance from interference with the bank's defective foreclosure ac-

tions. Such "consideration" is clearly pretextual and appears designed to divert fact finders from focusing on the essential proposition in which the defendant is demanding payment for no legitimate consideration.

quence of the threat of economic loss" or that the victim actually feared the alleged extortioner. *Id.; United States v. Sander,* 615 F.2d at 218. The Government need only "prove that the defendant performed certain acts, the necessary and natural effects of which were to instill fear in the victim." *United States v. Agnes,* 581 F. Supp. at 471.

■ While the term "fear" includes fear of economic loss, there is no extortion unless the payments were made under some form of compulsion. *United States v. Adcock,* 558 F.2d 397, 403 (8th Cir.1977), *cert. denied,* 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977); *United States v. Hathaway,* 534 F.2d at 395 (voluntary payments by "victim" would not constitute extortion).[9]

■ This compulsion can be the result of threatened preclusion from a right, benefit, or economic opportunity for which the defendant has no legitimate claim to payment. The availability of alternative means to obtain the same opportunity may, therefore, raise questions concerning the likelihood that the payments were compulsory, or that the defendant's actions can reasonably be understood to have instilled fear in the victim. *See United States v. Capo,* 817 F.2d at 954 (Hobbs Act convic-

tion overturned where "victims" voluntarily paid money to improve their chances to get jobs); *United States v. Rabbitt,* 583 F.2d at 1027 ("victim" had acquired state contracts in the past and during the period in question without the defendant's assistance and therefore record lacked substantial evidence that payment compulsory or result of reasonable fear). *Compare United States v. Troutman,* 814 F.2d 1428, 1455 (10th Cir.1987) (victims reasonably believed that they would not secure contract unless they met defendant's demands); *United States v. Hathaway,* 534 F.2d at 395 (victims feared loss of profitable contracts unless payments were made to defendants); *United States v. Lisinski,* 728 F.2d 887, 891 (7th Cir.), *cert. denied,* 469 U.S. 832, 105 S.Ct. 122, 83 L.Ed.2d 64 (1984) (victim buys "protection" from police officer); *United States v. Margiotta,* 688 F.2d 108, 133 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983) (overwhelming evidence that victim would lose its position as town and county insurance broker if payments not met); *United States v. Sander,* 615 F.2d at 219; *United States v. Brecht,* 540 F.2d at 52 (victim convinced he would be denied any chance to get contract unless he paid money). There was adequate evidence of compulsion by preclusion here.[10] Accordingly,

9. Speaking in the context of abuse of judicial office, Judge Posner has equated the fear species of wrongful inducement under the Hobbs Act as essentially a concern over adverse consequences.

> Except in cases involving a threat, or actuality, of force or violence, the payment must be induced either by fear of what the payee might do if payment were not forthcoming, or by the defendant's office ('color of official right'). The two types of inducement (fear and office) should be distinguished. The first is based on fear of retribution by the official, wielding his official powers; the second is based on a hope of benefit from the exercise of those powers. The first covers cases of actual or implied threat to use (or not use) official powers to harm a person if he doesn't pay the official, and corresponds to the lay sense of 'extortion'; the latter covers cases where bribes are offered and accepted even without having been solicited.

*United States v. Holzer,* 816 F.2d 304, 310 (7th Cir.), *petition for cert. filed* (June 2, 1987). Abuse of office cases, like *Holzer,* are frequently

charged under both fear of economic harm and color of official right Hobbs Act theories. As a consequence, these two species of non-violent extortion have followed parallel evolutionary lines. *See generally* note 3 *supra.*

10. There were some suggestions during the course of trial that the Bank's fear of economic loss was unreasonable because of the existence of an alternative to meeting Sturm's demands. According to the testimony of one WCIS official, the Bank could have had the logbooks reconstructed at a cost of approximately $4,000, or a fifth of the amount sought by Sturm. Even if feasible, however, the potential of this alternative does little to aid Sturm's defense. Sturm's leverage came from his ability to force the Bank to pay a significant amount of additional money to secure property for which it had already bargained and in which it held a security interest. Either payment would have been the result of compulsion produced by Sturm's threatened inaction in locating the logbooks. Far from making the fear Sturm sought to exploit unreasonable, the existence of the expensive, albeit less expensive, reconstruction alternative serves

the Government's proof was sufficient to meet the burden of showing the reasonableness of the fear.

–C–

To recapitulate, I am of the view that as a first step in analysis of a prosecution under the pure fear of economic harm branch of the Hobbs Act the Government must prove the defendant has asserted a claim for an economic right, benefit or property to which he is not entitled. If the Government passes that first step, it must then prove that the defendant's assertion of the wrongful claim could reasonably have induced fear in the victim.

■ In this case I have found that the Government satisfied its burden of demonstrating that Sturm lacked the pertinent claim of right to be paid for the logbooks and that his exploitation of the fear of economic harm by arranging their continued unavailability—in the absence of an additional payment—was therefore wrongful. I have further found that WCIS's fear of economic loss from the lack of the logbooks was reasonable principally because

of the dampening effect the unavailability of logbooks had on the Bank's opportunities to recover its lending loss through sale of the aircraft. For the reasons stated more fully above, I have accordingly denied defendant's Motion for Judgment of Acquittal[11] as to Count One.

III

■ The defendant sought judgment of acquittal as to Count Two on the grounds that two separate and assertedly contradictory theories regarding the underlying felony were presented to the jury and that one of these theories—larceny—could not properly be considered by the jury on the Government's evidence. Count Two charged that Sturm, in violation of 18 U.S.C. § 2113(a), entered WCIS with intent to commit a felony identified as Hobbs Act extortion or larceny. The defendant does not challenge the entry to commit Hobbs Act extortion theory of the § 2113(a) violation—nor can he. The requirement of entry supplies a separate element, for which there was sufficient evidence before the jury, to survive a double jeopardy chal-

---

to underscore the reasonableness of the Bank's fear.

**11.** Although the defendant has not mounted a post-trial challenge to the jury instructions by making a motion for a new trial, I have caused a transcript of them to be prepared in order to make a review in light of the extended reflection I have given to the proper means for analyzing fear of economic harm. While the instructions at trial would have been sharpened by this reflection, I am satisfied that the jury was directed to the relevant constituent elements of fear of economic loss.

The jury was instructed that the Government was required to prove the defendant had no lawful right to the property that he sought to obtain. Indeed, the jury was invited to consider whether Sturm's claim that the Bank's arguably defective repossession under the law governing the security agreement was as a factual matter sufficient to provide him with a superior claim of right. As noted above, *see* notes 5–7 *supra* and accompanying text, this dispute over immediate possessory rights was not dispositive. But there was no harm to the defendant in having the jury charged regarding it; he was the beneficiary of an additional jury issue which could have assisted him by providing an erroneous ground for acquittal on the claim of right aspect of fear of economic harm. In any event, with one limited exception, the defendant did not

object to the jury instructions on grounds of failure to instruct as to claim of right. The exception concerned a purported failure to charge regarding the limits of WCIS's interest in the transaction. Such an instruction was given, however. Jury Charge Tr. at 29.

The defendant's principal objections to the charge dealt with the contention that the jury should have been charged that the Hobbs Act is a specific intent crime and with the contention that the jury should not have been charged regarding larceny as a predicate for the bank felony statute.

I rejected the specific intent claim on the basis of the careful analysis in *United States v. Furey,* 491 F.Supp. 1048, 1059 (E.D.Pa) *aff'd* 639 F.2d 1211 (3d Cir.1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 304 (1981). In doing so, I declined to follow the dicta to the contrary in *United States v. Dabish,* 708 F.2d 240, 242 (6th Cir.1983) proffered by the defendant. The *Dabish dicta* was apparently erroneously invited by the Government in an effort to establish the basis for certain evidentiary submissions. *United States v. Agnes,* 753 F.2d at 300 n. 9.

The larceny question, which is an alternative grounds for the motion for judgment of acquittal, is discussed in Section III *infra.*

lenge under even the broadest reading of *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *See generally Therrien v. Vose,* 782 F.2d 1, 5 (1st Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 2285, 90 L.Ed.2d 727 (1986).

■ The challenge to the larceny theory, while unsupported by citation to authority, appears to proceed from the assumption that because lack of consent is an element of larceny while consent—albeit wrongfully induced—is an element of the Hobbs Act, it was inappropriate for the jury which found wrongfully induced consent in Count One to consider a lack of consent theory on Count Two. To the degree that the defendant's contention sounds in inconsistent jury verdicts, it is baseless. The verdicts are clearly consistent when read to evidence the jury's acceptance of the Hobbs Act theory on both Counts. In any event, there would be no reason to grant acquittal on Count Two merely because the verdict on that Count could not rationally be reconciled with that on Count One. *United States v. Powell,* 469 U.S. 57, 69, 105 S.Ct. 471, 479, 83 L.Ed.2d 461 (1984). This is not a circumstance in which conviction on one count necessarily precludes conviction on another count. *Cf. United States v. Daigle,* 149 F.Supp. 409 (D.D.C.) *aff'd* 248 F.2d 608 (D.C.Cir.1957), *cert. denied,* 355 U.S. 913, 78 S.Ct. 344, 2 L.Ed.2d 274 (1958).

Here the jury was charged on the two theories the prosecution presented which found support in the evidence. The "consent" which is an element of Hobbs Act extortion is obtained by compulsion. It is conceivable that a jury would view such wrongfully induced consent as no consent at all thereby justifying the larceny explanation for Sturm's attempt to part the victim and its property. The jury could reasonably have convicted on this evidence using either theory. The motion for judgment of acquittal on this Count was accordingly denied.

## IV

The analysis necessary to address the question whether the Hobbs Act is applicable to Sturm's activities, is similarly helpful in assessing the blameworthiness of his conduct for purposes of sentencing. The proposed guidelines of the United States Sentencing Commission provide a systematic framework within which to conduct this analysis. U.S. Sentencing Commission, *Sentencing Guidelines and Policy Statements for the Federal Courts,* 41 Crim.L.Rep. 3087 (Apr. 13, 1987). Those guidelines are especially pertinent here because they appear to have been tailored to anticipate the distinctions which the substantive law of extortion by threat of economic harm requires to be observed. Moreover, they corroborate my judgment that the offense is one for which more than a probationary sentence is appropriate.

■ Under the Sentencing Guidelines there are several ways to view the essential criminal offense for which Sturm stands convicted.[12] One characterization would be under § 2B3.3 which deals with blackmail and similar forms of extortion, defined in the Commentary as those offenses "where there clearly is no threat of violence to person or property."[13] 41 Crim.L.Rep. at 3100. The base offense level for such extortion is 9. The base offense is individualized here by the demand for $20,000, a specific offense characteristic which increases the base offense level by 3

12. Because the transaction proceeded as an FBI undercover operation, Sturm's offense was charged and proved as an attempt to violate the Hobbs Act. Under the Sentencing Guidelines the offense level for such an attempt would not be adjusted because "the defendant completed all the acts the defendant believed necessary for successful completion of the offense [and] the circumstances demonstrate that the defendant was about to complete all such acts but for apprehension or interruption by some ... event beyond the defendant's control." § 2X1.1(b)(1), 41 Crim.L.Rep. at 3125.

13. The Government suggested at the sentencing hearing that extortion by threat of injury to property under § 2B3.2, which involves a significantly more serious offense level would be appropriate. I do not find the threat of continued unavailability of the collateral to be the type of injury to property contemplated by § 2B3.2.

to bring the offense level to 12. *See* § 2B1.1(b)(1)(F), *id.* at 3098.

Alternatively, if this were treated as essentially a bank larceny offense under § 2B1.1, the offense level would be slightly less serious. The base level is 4 and would be increased 6 levels to 10 in order to reflect the $45,000 difference the withholding of the logbooks made to the resale value of the aircraft. *Id.*[14]

Yet another way to characterize the offense is to view the transaction, as a form of bankruptcy or creditor fraud, under § 2F1.1, *id.* at 3109, which—because it did not involve more than minimal planning or the use of foreign transaction devices—would justify an offense level of 9.[15]

I do not find any of the adjustments contained in Chapter Three of the Guidelines relating to victims, role in the offense or obstruction relevant to this offense.

The defendant has no prior criminal history.

Within this framework there are three basic components of sentence to be considered. The first is incarceration, the second is restitution and the third, a fine.

–A–

] Under the Sentencing Guidelines, which I have found instructive regarding the proper proportionate sentence to be imposed for this and other offenses,[16] the term of incarceration could range between four months and sixteen months depending upon whether the offense level was determined to be 9 or 12. 41 Crim.L.Rep. 3133.

 The Government's recommendation was 12 months of incarceration—well within this range. I note, in this connection, that the Model Penal Code classifies this form of extortion—involving interference with creditors' rights—to be a misdemeanor, *see* note 6 *supra*. Thus the offense has been seen as justifying a one year maximum penalty. Similarly, blackmail, to which this form of extortion is analogized under Section 2B3.3 of the Sentencing Guidelines, is also a misdemeanor. *See* 18 U.S.C. § 873. All of these factors suggest to me that a sentence of low to mid-range of the potential offense levels would be reasonable and proportionate.

The attorney for the defendant suggested at sentencing that this is a case where a suspended sentence would be appropriate. He referred to the broad mandate of the Sentencing Commission provided by 28 U.S.C. § 994(j) which requires the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence that results in serious bodily injury." The underlying premise in this argument is that the offense here was not a serious offense.[17]

The defendant himself in his statements to the Court adopted a variation of this characterization of the offense when he gave us the benefit of his view that "everybody has their price," presumably in support of the proposition that the issue

**14.** The value of the logbooks was characterized by Sturm as $45,000 for which he was offering a discounted return cost of $20,000. Thus, while the value can, for § 2B1.1 larceny purposes, be stated as $45,000, the amount demanded for § 2B3.3 extortion purposes can be stated as $20,000. The difference between value and demand accounts for the different specific offense level increases for the separate base offenses derived from the same table of loss. *See generally* § 2B1.1(b)(1).

**15.** Although Sturm made reference to locating the logbooks in the Cayman Islands during his discussion with the undercover FBI Agents, the parties agreed at sentencing that this reference to a foreign connection was apparently puffing.

**16.** It may bear emphasizing the obvious that my reference to the Sentencing Commission's proposed guidelines as "instructive" is meant to underscore that I view those guidelines, which have not yet been approved, as in no sense mandatory. The sentencing decision I have made is the result of my own exercise of discretion informed—but not dictated—by those materials, such as the proposed guidelines, which I find of assistance in that task. *Cf. Miller v. Florida,* —— U.S. ——, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987).

**17.** The Sentencing Commission presumably thought otherwise by making the offense subject to a period of incarceration irrespective of whether it was the defendant's first offense.

presented is of proper pricing and relative bargaining strength and not criminal culpability. The defendant maintains the position that the investigation resulting from his arrest was "a scheme between the two Bank officers and the FBI where they could get me to find the logbooks and then get out of paying me for the logbooks by saying that it was an extortion." From his perspective, the defendant observed, "[t]here did come a time when everybody has a price and when they, when they told me that they could make X amount of dollars if they have the logbooks, I saw an advantage and there's no doubt about it. And I said if you can make money then I should be able to recover some of my money, I'll help you find the logbooks."

The defendant's own observations are a dramatic illustration of the need for a sentence of incarceration in this case, where the defendant persists in treating his offense as nothing other than a bit of hard ball in which the other side employed an unfair stratagem by invocation of criminal law. In the face of the defendant's obdurate refusal to recognize his culpability, it bears emphasizing that it is not merely hard bargaining with which we are dealing. Rather we confront criminal activity undertaken by a sophisticated person intensely concerned that the balance of risk and return remain tipped in his direction.

The sanction for this activity—in order to be meaningful—must go beyond financial adjustments and reflect, as the Sentencing Guidelines do, a measure of community denunciation for the offense. This is a serious offense. That the effort to deprive the Bank of $20,000 was not effected by a less sophisticated individual using cruder tools to extract money from the Bank does not make Sturm's activity any less serious. A meaningful deterrent in this area should involve incarceration in order to demonstrate to the defendant and his peers that such economic activity will not be countenanced. As Arthur Liman observed in connection with other economic violations, "[f]or the purse snatcher, a term in the penitentiary may be little more unsettling than basic training in the army. To the businessman, however, prison is the infer-

no and conventional risk-reward analysis breaks down when the risk is jail. The risk of imprisonment, therefore, remains the most meaningful deterrent to antitrust violations." A. Liman, *Critique*, 86 Yale L.J. 630, 630–631 (1977).

I find persuasive the judgment as to the range of appropriate proportionate sentence proposed by the Sentencing Commission for this type of offense; I am satisfied that a period of incarceration within the misdemeanor range properly reflects just deserts for this crime; and I conclude that a sentence of six months incarceration brings a measure of general deterrence to a businessman like Sturm who uses wrongful means to obtain an unacceptable advantage through sophisticated extortionate demands.

–B–

The larger purpose of restitution is to make the victim whole for his loss. The potential for loss through a foreclosure, however, was the subject of bargaining and negotiation between the parties in their security agreement. Because this was an attempt rather than a completed crime, there was no loss beyond what was governed by the rights and obligations of the parties in those agreements. I recognize further that the Bank's foreclosure may well have been faulty, *see* note 5, *supra*, and that the defendant may have litigation remedies of his own to deal with such defects in repossession. *See, e.g., Klingbiel v. Commercial Credit Corp.*, 439 F.2d 1303 (10th Cir.1971). *Drew v. Chrysler Credit Corp.*, 596 F.Supp. 1371 (W.D.Mo.1984).

Where the potential for loss and the remedies for such loss are matters which have been the subject of a previous agreement between the parties and where the respective rights and responsibilities of the parties concerning allocation of the loss will require additional adjudication in other fora—which the alleged victim is fully capable of conducting—I am disinclined to order restitution as part of the criminal sentence.

Having considered the uncertainty of any loss actually sustained by the victim as a result of the attempted crime and the financial resources of the victim in establishing such a loss through other means, I decline under 18 U.S.C. § 3579(a)(2) to enter an order of restitution in this case.

## –C–

 By contrast, I am satisfied that a fine is appropriate in these circumstances. While the defendant suggested the imminence of bankruptcy both during his tape recordings with the Bank and in his conversations with the Probation Office, a bankruptcy petition has not been filed. The defendant has proved to be a remarkably resilient individual capable of tapping resources which might not have been obvious to others. Under the Sentencing Commission Guidelines a fine would be appropriate in this case and could range from a minimum of $1,000 to a maximum of $30,000 depending upon the base offense level chosen. § 5E4.2, 41 Crim.L.Rep. 3136–37.

I am satisfied that the proper figure at which to fix such a fine is $4,000, which reflects the amount at least one Bank officer indicated would have been required to reconstruct the property the defendant was secreting. This fine is intended to be punitive and is imposed for the purpose of reflecting in an economic sense the seriousness of the offense through an evaluation of the potential loss to the victim if it had chosen not to go along with the defendant's extortionate offer.

## V

For the reasons set forth above, a Judgment of Commitment reflecting the conclusions set forth herein shall enter.