UNITED STATES of America, Appellee,

v.

John Andrew STURM,
Defendant, Appellant.

No. 87–1832.

United States Court of Appeals,
First Circuit.

March 22, 1989.

James B. Dolan, by Appointment of the Court, with whom Badger, Sullivan, Kelley & Cole was on brief for defendant, appellant.

David L. Douglass, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., was on brief, for appellee.

Before CAMPBELL, Chief Judge, TORRUELLA, Circuit Judge, and ATKINS,* Senior District Judge.

## SUBSTITUTE OPINION

TORRUELLA, Circuit Judge.

The defendant John Sturm appeals from Judge Woodlock's denial of his Motion for a Judgment of Acquittal after a jury verdict finding him guilty of attempted extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, and of attempted bank robbery in violation of the bank theft statute, 18 U.S.C. § 2113(a). *See United States v. Sturm,* 671 F.Supp. 79 (D.Mass.1987). Sturm requests this court either to enter a judgment of acquittal or, in the alternative, to vacate his convictions and remand for a new trial.

* Of the Southern District of Florida, sitting by designation.

We affirm the district court's denial of Sturm's Motion for a Judgment of Acquittal, but vacate both convictions and remand for a new trial.

## I.

When evaluating the denial of a Motion for Judgment of Acquittal, we view the facts in the light most favorable to the government. *See United States v. McNatt,* 813 F.2d 499, 502 (1st Cir.1987). In May 1985, Sturm obtained a $110,000 loan from the Worcester County Institution for Savings (WCIS) by signing a promissory note and granting a purchase money mortgage in connection with his acquisition of an Aero Commander aircraft for $214,-000. In addition to the aircraft, the loan was secured by other related collateral, including the plane's logbooks. Logbooks record the repair and maintenance history of a plane and are required by the Federal Aviation Administration for all commercial aircraft. A plan without logbooks ordinarily can be used only for noncommercial purposes, and thus has a lower value.

Sturm fell behind on his loan payments in April and May 1986, but eliminated the arrears when WCIS requested him to do so. WCIS then learned that the People's Bank in Connecticut was considering filing a mechanic's lien against the Aero Commander because of problems in connection with their own loan to Sturm for purchase of another plane. On the basis of this information, WCIS repossessed defendant's Aero Commander in August. The act of repossession did not include the logbooks.

WCIS held an auction to sell the plane on September 26, 1986. Because the auction did not produce what the Bank considered to be the fair market price for the aircraft, WCIS took ownership of the plane. Bank officials learned that the low valuation was directly related to the unavailability of the plane's logbooks. After the auction, Steven Tonken, a WCIS officer, asked Sturm for the logbooks. The defendant replied, "I don't know where the books are right now but I can get them for you for a price." Trial Transcript, Vol. I, at 70. Later, he added that he "could be persuaded

to recall or remember where the logbooks were for a fee." *Id.* Tonken refused to pay Sturm a fee for the logbooks.

Sturm called WCIS officers inquiring about the status of the aircraft on October 29 and November 26. On each occasion, he offered to help find the logbooks if he were paid a fee. When the officers explained that it was in Sturm's interest to have the plane sold at the highest possible price, Sturm disagreed, stating that he was not worried about residual indebtedness because he was going to file for bankruptcy. WCIS contacted the Federal Bureau of Investigation after the November 26 call. All subsequent conversations were recorded.

On December 2, Sturm spoke to Phillip Zoppo, another WCIS official. He told Zoppo that he could not find the logbooks but wanted to make some money selling airplanes for WCIS at a commission. Sturm then pointed out that the logbooks would increase the value of the aircraft by more than $45,000, and therefore that the logbooks themselves were worth about $20,-000. He added that he could find the books "if the price is right." Government Exhibit 5–A at 9. Zoppo asked Sturm why WCIS should pay to recover its own property. Sturm replied, "I understand the books should go with the airplane and everything, but in fact they're not." Government Exhibit 6–A at 2. In a subsequent conversation later the same day, Zoppo informed him that senior management had acceded to his demands; WCIS would pay him $20,-000 for the logbooks.

Two days later, on December 4, Sturm called Zoppo and informed him that he had the logbooks. The next day, two FBI agents posing as WCIS officers met with Sturm. He said he had gone to the Cayman Islands to retrieve the logbooks, and offered to exchange them for $20,000 in cash. The agents reiterated that if he left with the $20,000, WCIS would be paying for property which it rightfully owned. Sturm replied, "You keep bringing that up. You don't need to." Government Exhibit 9–A at 6. One of the agents mentioned to Sturm that the transaction reminded him of

kidnapping, to which Sturm responded, "I know." *Id.* at 15. Sturm was arrested in the WCIS parking lot after he showed the agents the logbooks in the trunk of his car.

## II.

The Hobbs Act, 18 U.S.C. § 1951 (1982), states in pertinent part:

(a) Whoever in any way or degree ... affects commerce or the movement of any article ... in commerce, by robbery or extortion or attempts or conspires to do so, ... shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section

.    .    .    .    .

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

The defendant claims that his conviction for attempted extortion should be reversed for any one of four reasons. First, Congress did not intend the Hobbs Act to apply to actions based on a creditor's fear of nonrepayment. Second, Sturm could not be guilty of extortion because he had a claim of right to the logbooks. Third, even if Sturm did not actually have a claim of right to the logbooks, he cannot be guilty of extortion because he thought he had a claim of right to the logbooks. Fourth, the trial judge failed to instruct the jury that extortion under the Hobbs Act is a crime of specific intent, requiring proof that the defendant intended to violate the statute.

### A.

Sturm's first claim is that Congress did not intend the Hobbs Act to apply to actions based on a creditor's fear of nonrepayment. He supports this claim by pointing to the absence of any mention of such actions in both the statute's legislative history and in cases interpreting the statute. He argues that extending the statute to include such actions would interfere with state sovereignty and squander federal judicial resources.

We find Sturm's arguments unpersuasive. The statute provides a precise definition of extortion, and there is persuasive evidence that Congress intended "to make punishable all conduct falling within the reach of the statutory language." *United States v. Culbert*, 435 U.S. 371, 377, 98 S.Ct. 1112, 1116, 55 L.Ed. 2d 349 (1978) (holding that proof of racketeering was not a separate prerequisite to criminal liability under the Hobbs Act). The purpose of the statute was "to prevent *anyone* from obstructing, delaying, or affecting commerce, or the movement of any article or commodity in commerce by robbery or extortion as defined in the bill." H.R.Rep. No. 238, 79th Cong., 1st Sess., 9 (1945) (emphasis added) (quoted in *Culbert*, 435 U.S. at 377–78, 98 S.Ct. at 1115–16). The statute manifests Congressional intent "to use all the constitutional power [it had] to punish interference with interstate commerce by extortion, robbery, or physical violence." *Stirone v. United States*, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). We recognize that ambiguity in the scope of criminal statutes should be resolved "in favor of lenity," *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971), but "here Congress has conveyed its purpose clearly, and we decline to manufacture ambiguity where none exists," *Culbert*, 435 U.S. at 379, 98 S.Ct. at 1116. In light of the plain language of the Act and the intent of its framers, the absence in the legislative history and prior case law of any specific mention of an action based on a creditor's fear of nonrepayment is less than compelling.

Sturm's federalism arguments meet a similar fate. With respect to the enactment of the Hobbs Act, the Supreme Court has concluded that

there is no question that Congress intended to define as a federal crime conduct that it knew was punishable under state law. The legislative debates are replete with statements that the conduct punishable under the Hobbs Act was already punishable under state robbery and extortion statutes. Those who op-

posed the act argued that it was a grave interference with the rights of states. Congress apparently believed, however, that the states had not been effectively prosecuting robbery and extortion affecting interstate commerce and that the Federal Government had an obligation to do so.

*Culbert,* 435 U.S. at 379–80, 98 S.Ct. at 1116–17 (citations omitted). In addition, following the lead of the Supreme Court, other appellate courts have refused to exempt particular industries that have traditionally been regulated by the states, such as liquor, *see United States v. Gill,* 490 F.2d 233, 237 (7th Cir.1973), *cert. denied,* 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1139 (1974), and insurance, *see United States v. Hoelker,* 765 F.2d 1422, 1424–25 (9th Cir. 1985), *cert. denied,* 475 U.S. 1024, 106 S.Ct. 1219, 89 L.Ed.2d 330 (1986), from the ambit of the Hobbs Act. Given these cases, we see no compelling justification for creating an exception to the Hobbs Act for the business of lending.

We therefore hold, based on the facts of this case, that a Hobbs Act prosecution may be based on a creditor's fear of nonrepayment, and affirm the trial court's refusal to enter a Judgment of Acquittal on this ground.

### B.

Sturm's second claim is that he was entitled to a judgment of acquittal because he had a claim of right to the logbooks. This claim is based on two premises: first, that there is a claim of right defense to charges of extortion induced by wrongful use of economic fear, and second, that his conduct is immunized by that defense. We examine each premise in turn.

The claim of right defense originated in *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), in which the defendants were charged with attempting to obtain higher wages and other benefits for striking employees through the wrongful use of actual force and violence. The main issue before the Supreme Court was whether the term 'wrongful' in the

statute applied to the means used or to the ends sought by the alleged extortioner. Justice Stewart, in his majority opinion for the Court, resolved this issue in the following manner:

> The term 'wrongful,' which on the face of the statute modifies the use of each of the enumerated means of obtaining property—actual or threatened force, violence, or fear—would be superfluous if it only served to describe the means used. For it would be redundant to speak of 'wrongful violence' or 'wrongful force' since, as the government acknowledges, any violence or force to obtain property is 'wrongful.' Rather, 'wrongful' has meaning in the Act only if it limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property.

*Enmons,* 410 U.S. at 399–400, 93 S.Ct. at 1009–10 (footnotes omitted). This reasoning created the claim of right defense to charges of extortion under the Hobbs Act. *See United States v. Agnes,* 753 F.2d 293, 298 (3d Cir.1985). Despite its broad language, most federal appellate courts, including this court, have restricted *Enmons* and its claim of right defense to the labor context, fearing that a broader application "could effectively repeal the Hobbs Act." *United States v. Cerilli,* 603 F.2d 415, 419 (3d Cir.1979), *cert. denied,* 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980); *accord United States v. Zappola,* 677 F.2d 264, 269 (2d Cir.), *cert. denied sub nom. Melli v. United States,* 459 U.S. 866, 103 S.Ct. 145, 74 L.Ed.2d 122 (1982); *United States v. Porcaro,* 648 F.2d 753, 760 (1st Cir.1981); *United States v. French,* 628 F.2d 1069, 1075 (8th Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980).

Although it may be appropriate not to recognize a claim of right defense in extortion cases based on the wrongful use of force or violence, different considerations apply in the context of extortion based on

economic fear.[1]  Whereas the use of actual or threatened force or violence to obtain property is inherently wrongful, *see Enmons,* 410 U.S. at 399–400, 93 S.Ct. at 1009–10, there is nothing inherently wrongful about the use of economic fear to obtain property, *see United States v. Kattar,* 840 F.2d 118, 123 (1st Cir.1988); *United States v. Clemente,* 640 F.2d 1069, 1077 (2d Cir.), *cert. denied,* 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981).  We pointed out in *Kattar* that this conclusion does not imply that all forms of economic fear are inherently legitimate.  *See Kattar,* 840 F.2d at 124 n. 3.  Although we are not aware of any cases so holding, we do not rule out the possibility that the use of wrongful economic threats to obtain property to which the defendant is legally entitled may be prosecutable as extortion under the Hobbs Act.

■  The point of the preceding discussion is that unlike extortion cases based on the use of force and violence, extortion cases based on the use of economic fear typically will not involve allegations of wrongful means, but only allegations of wrongful ends.  For these typical economic fear cases, it is self-evident that a defendant cannot be found guilty of wrongfully obtaining property through the use of a legitimate economic threat if he has a claim of right to the property.  In fact, in every appellate case we have found in which a conviction for extortion induced by the wrongful use of economic fear was affirmed, the defendant was held to have no claim of right to the property in question.  *See, e.g., Kattar,* 840 F.2d at 124; *United States v. Russo,* 708 F.2d 209, 215 (6th

Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 487, 78 L.Ed.2d 682 (1983); *Clemente,* 640 F.2d at 1076–78; *United States v. Quinn,* 514 F.2d 1250, 1259, 1266 & n. 18 (5th Cir.), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1975).  We therefore hold that for purposes of the Hobbs Act, the use of legitimate economic threats[2] to obtain property is wrongful only if the defendant has no claim of right to that property.[3]  Since the government has not alleged that Sturm used wrongful means, the claim of right defense is available to him.[4]

We now consider whether Sturm's conduct was protected by the claim of right defense.  First, he argues that he had a right to possession of the logbooks because no default had been declared on the loan.  Even if Sturm is correct that WCIS' repossession was faulty under state law,[5] his argument is meritless because debtors have no right to charge creditors a fee for "locating" collateral.  As Judge Woodlock noted in his thoughtful opinion below, "[t]he Bank's failure to follow proper procedures in repossessing the aircraft would in no way eliminate its security interest in the logbooks, or enlarge Sturm's rights to the extent that he was free to extract additional funds—beyond those already provided as part of his loan transaction—by a new promise of safe return for the Bank's collateral."  *Sturm,* 671 F.Supp. at 87.  Sturm alternatively argues that he did not know where the logbooks were, and that he had no obligation to find them for WCIS.  On the contrary, he asserts that he had a right to charge WCIS a fee to find the logbooks.  As a matter of law, if Sturm truly did not know the whereabouts of the

1.  We express no opinion about extortion of property induced by noneconomic fear.

2.  We express no opinion on whether there is a claim of right defense to a Hobbs Act prosecution for the use of wrongful economic threats to obtain property to which the defendant has a legitimate entitlement.

3.  The significance of the defendant's state of mind with respect to the claim of right is discussed in Part IIC.

4.  The dispute is over Sturm's right to charge WCIS for locating the logbooks, not over his right to remind WCIS of the loss it would suffer

if it did not recover the logbooks.  *See United States v. Sturm,* 671 F.Supp. 79, 87 (D.Mass. 1987) (stating that Sturm's conduct would be "unsanctionable" if WCIS had no security interest in the logbooks).

5.  Sturm also argues that in addition to the logbooks, the consideration he gave for the $20,000 fee included a release of his claims against WCIS for its allegedly illegal repossession of the aircraft.  We find, as a matter of law, that no rational factfinder could have reached this conclusion based on the evidence in the record.

logbooks, he could conceivably have demanded a fee from WCIS for making extra efforts to locate them. Whether he was sincere, however, is a factual issue for the jury to decide. Judge Woodlock instructed the jury on Sturm's claim of right defense; the guilty verdict indicates that the jury resolved this factual issue against Sturm. Because we are unable to state that the evidence, viewed in the light most favorable to the government, was insufficient to support this finding, we hold that his conduct is not protected by the claim of right defense, and affirm the trial court's refusal to enter a Judgment of Acquittal on this ground.

### C.

Sturm's third argument is that there was insufficient evidence as a matter of law to support a finding that he knew he was not legally entitled to the $20,000 fee. This claim is also based on two premises: first, that the government must prove that the alleged extortioner knew that he was not legally entitled to the property in question, and second, that there was insufficient evidence to prove that Sturm knew that he was not legally entitled to the $20,000. We again consider each premise in turn.

We faced the issue of whether the government must prove that the alleged extortioner knew he had no legal entitlement to the property in question in *Kattar*, 840 F.2d at 124 n. 4, but did not have to resolve it because we concluded that the jury had made such a finding. We must address this issue here because, as explained below, we cannot be certain that the jury did make such a finding in this case.

We conclude that the term "wrongful" requires the government to prove, in cases involving extortion based on economic fear, that the defendant knew that he was not legally entitled to the property that he received. Our conclusion is grounded in the notion, "universal and persistent in mature systems of law," that "an injury can amount to a crime only when inflicted with intention." *Morissette v. United States*, 342 U.S. 246, 250–51, 72 S.Ct. 240, 243, 96 L.Ed. 288 (1952). Neither party disputes the fact that the Hobbs Act requires proof of intent. The critical issue is what level of intent is required for the 'wrongful use' element of the offense of extortion induced through wrongful use of fear. As explained in Part IIB, *supra*, we believe that this element requires the government to prove that the defendant did not have a claim of right to the property in question. As regards intent, we also believe the statute requires the government to prove, at a minimum, that the defendant *knew* that he was not legally entitled to the property. The necessity of such a requirement can be demonstrated through the example we cited in *Kattar*, 840 F.2d at 123. Two parties, A and B, enter into a contract. A sincerely believes that B has breached the contract, and threatens litigation unless B abides by A's interpretation of the contract. B refuses to do so, and the judgment in the ensuing lawsuit indicates that B had not breached the contract. May A then be convicted of attempted extortion based on the threat of litigation? We think not. Even though A had no objective right to the contractual entitlement she sought, her threat of litigation does not amount to attempted extortion because A subjectively thought that she had a right to the contractual entitlement. *See United States v. Aguon*, 851 F.2d 1158, 1168 (9th Cir.1988) (en banc); *United States v. Arambasich*, 597 F.2d 609, 612 (7th Cir.1979). It would be unjust to convict A of extortion unless she knew she had no claim to the property that she allegedly sought to extort. Similarly, if Sturm genuinely believed that he was entitled to charge WCIS a fee for locating the logbooks, he cannot be guilty of attempted extortion.[6]

---

**6.** We realize that many defendants will claim that they thought they were legally entitled to the property they allegedly extorted. The factfinder is not obligated, however, to believe these claims. The defendant's other statements and actions may lead the factfinder to question the defendant's sincerity. For example, in this case, as explained below, the jury could have disbelieved Sturm's claim that he thought he was legally entitled to a $20,000 fee from the bank based on the statements he made to WCIS officers and to undercover agents.

Turning to the second premise, Sturm claims that the evidence was insufficient, as a matter of law, to prove that he knew he was not entitled to the $20,000 fee. Defendant's counsel points out that Sturm negotiated the details of this transaction openly, intended to exchange the logbooks at a prearranged time and place, and made no effort to conceal his identity. "Sturm was either the stupidest criminal ever arrested by the FBI or a man who honestly thought he was not committing a crime." Brief for the Appellant at 33. This argument is meritless. When the evidence is considered in the light most favorable to the government, it was certainly sufficient to have supported the jury's finding. The most damning piece of evidence in this regard is that Sturm himself acknowledged that the transaction he was proposing was similar to kidnapping. The jury could also have concluded from Sturm's insistence on being paid in cash that Sturm knew that he had something to hide. As regards the defendant's contentions, the jury may have concluded that Sturm was a stupid criminal, or that he had nothing to gain from concealing his identity or the venue for the exchange. In any event, "[t]he choice among various reasonable constructions of the evidence is for the trier of facts." *United States v. Klein,* 522 F.2d 296, 302 (1st Cir.1975). Accordingly, we affirm the trial court's refusal to enter a Judgment of Acquittal on this ground.

■ Although there was sufficient evidence for the jury to conclude that Sturm knew he had no legal right to the $20,000 fee, we can not be certain that the jury actually made such a finding. The conviction on this count must be vacated because the trial court did not instruct the jury that in order to convict the defendant of attempted extortion, it would have to find that Sturm knew that he was not legally entitled to a fee to help WCIS recover the logbooks. The requirement that the defendant know that he was not legally entitled to the property in question stems from the

statute's use of the term "wrongful." Explaining this term, the trial court instructed the jury that "[w]rongful, as in wrongful use of fear, means that the Defendant had no lawful right to the property that he sought to obtain." Trial Transcript, Vol. V, at 119. The Court's definition of "wrongful" was purely objective. By making no reference to the defendant's state of mind, the instruction suggested that Sturm's mens rea was irrelevant. This omission was exacerbated by the court's subsequent instruction on specific intent. The trial court stated that "[t]he government is not required to provide, however, evidence that the Defendant knew those intentional acts were themselves illegal. In this case, ignorance of the law is no excuse." *Id.* at 125. The instruction may have referred to ignorance of the Hobbs Act itself, but given the absence of any instruction on the defendant's subjective intent with respect to the element of wrongfulness, the jury may have concluded that it could find Sturm guilty of attempted extortion even if it found credible his claim that he sincerely believed that he was legally entitled to a fee for helping WCIS locate the logbooks. We hold that the instruction which permitted such a conclusion is erroneous.[7]

It is not clear whether the defendant made an adequate objection to this instruction on this ground at trial. Rule 30 requires a party to "stat[e] distinctly the matter to which he objects and the grounds for his objection." Fed.R.Crim.P. 30; *see United States v. Glenn,* 828 F.2d 855, 862 (1st Cir.1987) (holding that defendant must have clearly objected at trial to the matter he is raising on appeal); *United States v. Harrigan,* 586 F.2d 860, 864 (1st Cir.1978) (holding that objection must "reasonably be expected to alert" the trial court to the ground subsequently raised on appeal). The purpose of this requirement is to bring to the attention of the trial court errors or omissions in its charge so that they may be

---

7. This case is different from *Kattar.* There, the court found the instructions "more than sufficient" because the judge instructed the jury that to convict the defendant, it would have to find

that the defendant intended " 'to do something forbidden by law.' " *Kattar,* 840 F.2d at 124 n. 4. There was no comparable jury instruction in this case.

corrected before the case goes to the jury. *See Golden v. United States*, 318 F.2d 357, 360 (1st Cir.1963).

There is no question that the defendant objected to the instruction, and requested that it be replaced with a specific intent instruction.[8] The problem lies in the substitute instruction proposed by the defendant. It begins by stating that the jury can find the defendant guilty only if it finds that "he knowingly did an act which the law forbids, purposely intending to violate the law." As part of the same instruction, the defendant also sought to charge the jury that "ignorance of the law is a defense to the charge. If Mr. Sturm did not think his conduct was illegal, if he did not think that he was taking the property of WCIS, if he thought he was justified in asking a fee for services in finding the logbooks, you must acquit him."

This substitute instruction is, at best, confusing. It uses two different definitions of specific intent. Under the first definition, specific intent is equivalent to an evil motive, and is manifested by a deliberate intention to disobey a statute. *See United States v. Haldeman*, 559 F.2d 31, 114 n. 226 (D.C.Cir.1976) (en banc) (per curiam), *cert. denied sub nom. Ehrlichman v. United States*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). A defendant cannot be guilty of a specific intent offense unless he deliberately intended to disobey the law defining that offense. *See id.* Using this definition of specific intent, the defendant's instruction directed the jury to find Sturm innocent if he was ignorant of the Hobbs Act. Under the second definition, specific intent means a special mental element which is required above and beyond any mental state necessary with respect to the actus reus of the crime. *See* W. LaFave & A. Scott, *Substantive Criminal Law*, § 3.5, at 315 (1986). In this context, one element of extortion is lack of a legitimate claim to the property in question. Using this definition of specific intent, the defendant's instruction directed

the jury to find Sturm innocent as long as he believed that he had a legitimate claim to a finder's fee. Thus the jury was directed to find Sturm innocent if he was ignorant of the law establishing the respective rights of debtors and creditors. *See Model Penal Code*, comment to § 2.02, at 131 (Tent.Draft No. 4, 1955) (distinguishing between the law defining the offense and the law characterizing attendant circumstances that are material to the offense).

The defendant's instruction failed to distinguish between these two versions of specific intent. Nor did it indicate whether the two versions should operate concurrently or whether they were mutually exclusive (and if the latter, which version was to be preferred). Judge Woodlock's charge focuses on the first version of specific intent; it does not address the second version. Under these circumstances, it is a close question whether the defendant's substitute instruction could "reasonably be expected to alert" the trial court to the flaw in the instruction that we have focused on in our opinion. *Harrigan*, 586 F.2d at 864; *see also United States v. Bass*, 535 F.2d 110, 116 (D.C.Cir.1976) (Bazelon, C.J.) ("It is seldom clear to what extent counsel can be expected, in the heat of trial, to formulate objections with precision, or to what extent trial judges can be expected, in the heat of trial, to divine the true reason for concern in an inartfully phrased objection."). Fortunately, we do not need to resolve this close question because there is no doubt that the instruction in question amounts to plain error.

■ Ordinarily, we do not consider issues that were not raised at trial. *See United States v. Griffin*, 818 F.2d 97, 100 (1st Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987). Nevertheless, we retain the power to consider such issues, even on our own initiative, to prevent a "clear miscarriage of justice." *Nimrod v. Sylvester*, 369 F.2d 870, 873 (1st Cir.1966). This case meets that exacting

**8.** This instruction is quoted in the Appellant's Brief at page 24. Appellant provides no citation to the record, and our own review of the record has failed to unearth this proposed instruction.

Since the government has not disputed its authenticity, we accept Sturm's version of the proposed instruction.

standard. Jury instructions that allow a conviction even though the jury may not have found that the defendant possessed the mental state required for the crime constitute plain error. *See Screws v. United States*, 325 U.S. 91, 107, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495 (1945) (plurality opinion); *United States v. Aguon*, 851 F.2d 1158, 1168 (9th Cir.1988) (en banc). Furthermore, the sacred status that our system of criminal law accords *mens rea* mandates that such an error cannot be treated as harmless. *See id.*

Our decision does not imply that we believe Sturm did not know that the fee he was demanding was illegal. Even if we were persuaded by the record that Sturm had the intent required by the statute, we are not authorized to substitute our judgment for that of the jury because existence of intent "is a question of fact which must be submitted to the jury." *Morissette v. United States*, 342 U.S. 246, 274, 72 S.Ct. 240, 255, 96 L.Ed. 288 (1952). As Justice Jackson explained in that case, "juries are not bound by what seems inescapable logic to judges." *Id.* at 276, 72 S.Ct. at 256.

### D.

Because we have already determined that the defendant is entitled to a new trial, we do not assess Sturm's claim that he is entitled to a new trial because the district court failed to instruct the jury that it could not find Sturm guilty unless Sturm purposely intended to violate the Hobbs Act.

Before turning to the second count, we wish to clarify what we have and what we have not decided with respect to Sturm's specific intent claims. Heeding the advice of the Supreme Court, we have avoided specific intent terminology and instead have used the Model Penal Code's element-by-element approach towards intent. *See United States v. Bailey*, 444 U.S. 394, 403,

100 S.Ct. 624, 631, 62 L.Ed.2d 575 (1980); *see also United States v. Arambasich*, 597 F.2d 609, 611 (7th Cir.1979). Pursuant to that approach, we have held that in cases involving extortion based on wrongful use of economic fear, the intent component of the wrongfulness element requires the government to establish that the defendant knew that he had no legitimate claim of right to the property in question. This holding corresponds in the following manner to Sturm's specific intent claims. To the extent that our holding requires a mental state above and beyond the mental state required with respect to the actus reus of extortion, we agree that extortion under the Hobbs Act requires the "special mental element" version of specific intent that we have described above.[9] We do not, however, express any opinion about the intent required for other elements of this offense. Nor do we express any opinion about whether extortion under the Hobbs Act requires the "evil motive" version of specific intent that we have described above.

### III.

Our sole remaining task is to consider the effect on the second count of our decision on the first count. The second count charged Sturm with having entered WCIS with intent to commit a felony, in violation of 18 U.S.C. § 2113(a). The jury was instructed that it should enter a guilty verdict on this count if, in addition to finding that Sturm had entered WCIS, it found that he had committed either attempted extortion under the first count, or attempted larceny. Trial Transcript, Vol. V, at 125–26. Thus, the conviction on the second count could be based on the conviction on the first count. Because we have reversed the conviction on count one, and because it is impossible to divine the jury's rationale for its general verdict on count two, it necessarily follows that the conviction on

---

**9.** This ruling is not heretical. Even *United States v. Furey*, 491 F.Supp. 1048 (E.D.Pa.), *aff'd without opinion*, 636 F.2d 1211 (3d Cir.1980), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 304 (1981), which concluded that the extortion under the Hobbs Act was a general intent crime, conceded that the defendant must have the "general" intent to "exploit the fear ... of the victim in order to wrongfully obtain the property. The critical element is that the defendant played upon or exploited the fear of the victim and, by doing so, wrongfully obtained the property of the victim with his consent but involuntarily." *Id.* at 1061 (citations omitted).

the second count must also be reversed. *See Zant v. Stephens,* 462 U.S. 862, 881, 103 S.Ct. 2733, 2744–45, 77 L.Ed.2d 235 (1983); *Kattar,* 840 F.2d at 123.

Accordingly, *both the convictions are vacated, and the case is remanded to the district court for a new trial.*