**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

WILLIAM DWIGHT DAANE,
    *Defendant-Appellant.*

No. 05-50282

D.C. No.
CR-01-01155-DDP-
02

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

TERE THOMPSON DAANE,
    *Defendant-Appellant.*

No. 05-50283

D.C. No.
CR-01-01155-DDP-
03

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

GLENN HURST TRENT, JR.,
    *Defendant-Appellant.*

No. 05-50295

D.C. No.
CR-01-01155-DDP-
01

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

RICHARD ERIC MILLER,
    *Defendant-Appellant.*

No. 05-50309

D.C. No.
CR-01-01155-DDP-
06

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

JOHN WILLIAM ARN, aka John Arn,
          *Defendant-Appellant.*

No. 05-50346

D.C. No.
CR-01-01155-DDP-
04

OPINION

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted
June 7, 2006—Pasadena, California

Filed February 1, 2007

Before: Dorothy W. Nelson, Johnnie B. Rawlinson, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Rawlinson

## COUNSEL

Donald W. MacPherson, Glendale, Arizona, for appellants William and Tere Daane.

Jeff Price, Santa Monica, California, for appellant Glenn Trent.

Stephen M. Lathrop, Rolling Hills Estates, California, for appellant Richard Miller.

Karen L. Landau, Oakland, California, for appellant John Arn.

Jerry A. Behnke, Assistant United States Attorney, Riverside, California, for appellee United States.

## OPINION

RAWLINSON, Circuit Judge:

Appellants William and Tere Daane (collectively the Daanes), Glenn Trent (Trent), Richard Miller (Miller), and John Arn (Arn) appeal their convictions for conspiracy and attempted extortion. Because we conclude that the district court committed no error when it rejected the appellants' proffered "claim of right" instruction, we affirm the convictions.[1]

### I.   Overview

Appellants were indicted for conspiracy and attempted interference with commerce in violation of 18 U.S.C. § 1951 (the Hobbs Act), and traveling in interstate commerce for the

---

[1]Appellants raised other issues, which are addressed in a memorandum disposition filed contemporaneously with this opinion.

purpose of extortion. The indictment alleged, *inter alia*, that appellants traveled to Riverside, California from outside the state in order to "assault, restrain and abduct Leslie Darwin Murdock (Murdock) and force him to transfer money interstate from Murdock's bank accounts to accounts controlled by the defendants and others." The indictment also alleged that William Daane knowingly possessed a firearm in furtherance of crimes of violence in violation of 18 U.S.C. § 924(c). At the conclusion of appellants' first trial, the district court granted their motion for a new trial because of juror misconduct.

One of the appellants' co-defendants, Mark Stich (Stich), pled guilty and testified at appellants' second trial.

## II.   Background

### A.   The Ponzi Scheme and Recovery Efforts

Murdock pled guilty in a separate case to three counts of mail fraud. Although Murdock guaranteed a five percent weekly return to investors, his investment plan was in reality a Ponzi scheme.[2] Approximately 950 individuals invested in Murdock's business, including the appellants. The total loss to these investors was approximately $20 to $40 million.

Murdock had his first personal meeting with the Daanes and Miller in a hotel in Las Vegas. They discussed "opportunities to continue [Murdock's] program offshore." A couple of weeks after the Las Vegas meeting, Murdock met with Tere Daane and Arn in Temecula, California, where they discussed expansion of the scheme.

Shortly thereafter, Murdock met with Stich. Stich "made a

---

[2] A Ponzi scheme pays investors with money received from later participants.

demand on his return of his principal." Murdock finally agreed in writing to repay Stich.

After the meeting with Stich, Murdock traveled to Las Vegas to meet with the Daanes. Murdock met the Daanes and Arn at a restaurant in the Orleans Casino. They had a cordial conversation and the Daanes invited Murdock to their house for further discussions. At the Daanes' residence, the Daanes and Arn presented Murdock with documents entitled "What We Know" and "What We Can Do For Leslie D. Murdock."

The "What We Know" document contained information allegedly related to Murdock's finances and Ponzi scheme. For example, it stated that Murdock had an active accounts investment total of $10,000,000; Murdock made 3,900 wire transfers through seventeen banks; and Murdock was being investigated by the FBI and Treasury Department for money laundering and bad checks.

The "What We Can Do For Leslie D. Murdock" document referred to the creation of an offshore business structure; assistance in securing a second citizenship and passport for Murdock; the ability to "make LDM [Murdock] an invisible investor" and to "get LM [Murdock] of [sic] the federal income tax system."

During the discussions, Murdock, Tere Daane, and Arn moved into the kitchen. When Miller and Trent entered the kitchen, Trent moved toward Murdock and stated, "You don't know who I am, do you." Trent surprised Murdock since neither Tere Daane nor Arn had told him that other people would be joining them. Trent immediately demanded the return of $75,000 from Murdock and threatened Murdock that they "were going to the desert until [Trent] was satisfied."

After Tere Daane and Arn intervened to keep the peace, Murdock agreed to take Trent back to Riverside. Arn volunteered to go instead, and Murdock agreed to sign a promise

to repay Trent $78,000. Arn was to stay with Murdock to "provide upkeep and transfer particulars up to the payment of said funds." Arn was also supposed to work on obtaining reimbursement for a list of individuals provided by Tere Daane. The total amount of reimbursement to these individuals approximated one million dollars.

During their drive to California, Murdock and Arn conversed about the events at the Daanes' residence. Arn told Murdock that Arn was nervous because there was a gun in the back of Trent's shorts.

Murdock took Arn back to Las Vegas after approximately two weeks in Riverside. Although Murdock assured Arn that he was going to proceed with their plan to restructure the investment program, Murdock later called Arn and informed him that Murdock was going to declare bankruptcy.

## B.  The Trip To Pasadena

On September 20, 2001, Stich, the Daanes, Arn, Miller, and Trent met in Trent's hotel room. Trent stated that he did not care "if they found Mr. Murdock buried in the sand." They discussed going to Pasadena the next day, and Trent suggested that they "should take Murdock somewhere." Trent also mentioned, "Mr. Murdock's a big man. I'm going to need some help with him because of his size . . ." William Daane and Miller agreed to help with Murdock, but Stich refused. Arn stated that "he had an uncle that had a hotel in the desert where Mr. Murdock could be taken." Trent suggested that they "band-tie" Murdock's hands, "duct tape his feet, put him in a car, and take him out to the desert." Tere Daane also stated that she had a fax machine and wiring instructions for transferring funds to an international account. There was no discussion of firearms at this meeting.

The following morning, Stich, Miller, Arn, Trent, and the Daanes prepared to go to Pasadena. When Stich was placing

his bags into William Daane's Suzuki, he saw draw ties[3] and duct tape. Stich had also purchased two pairs of gloves and duct tape. Stich rode with William Daane to Pasadena. Arn and Tere Daane were in a white Cherokee, with Miller and Trent in a blue Ford Taurus rental car. After locating Murdock's car in a Staples parking lot, William Daane told Stich to place the ties and duct tape into Trent's blue rental car.

After Stich spotted Murdock running down the street, William Daane used a two-way radio and stated, "The rabbit's on the run." Tere Daane also had a two-way radio, and she repeated that "[t]he rabbit is on the run." William Daane then moved his car to a parking lot where Tere Daane and Arn were waiting in the white Cherokee. In the parking lot, William Daane retrieved a plastic box from the Cherokee's cargo area. William Daane returned to his car, placed the plastic box on Stich's lap, and confirmed that it contained a gun. Afterwards, William Daane and Stich drove to the Staples parking lot. When they arrived, Stich saw Murdock get into his car. Trent ran up to Murdock's car and held the door open. As Trent tried to pull Murdock from his car, a struggle ensued and police officers were called.

Stich slid the box containing the gun underneath the driver's seat of the Suzuki. As Stich was walking away from the incident, William Daane told him to "hide the gun," but Stich had already placed it underneath the seat. After they were arrested, William Daane told Stich that "he was going to tell the police that the guns were for a hunting trip."

## C.   The Pasadena Investigation

Officer Howlett responded to the incident at the Staples parking lot. Initially, Trent, Miller, and William Daane denied that an altercation had occurred. They also denied having any

---

[3]The terms "draw ties" and "flex ties" are used interchangeably in this opinion to refer to plastic ties found at the scene of the altercation.

of Murdock's property. Officer Howlett asked three or four times for them to return Murdock's telephone and keys. After being threatened with arrest for robbery, Trent and William Daane returned the items to Murdock.

Miller permitted Officer Howlett to search the blue rental car. She noticed a two-way radio on the center console; a pair of gloves; a full roll of duct tape in the passenger's seat; and plastic flex ties on the passenger floorboard. Miller admitted that he had used the two-way radio in the car "to communicate with his friends."

After Officer Howlett approached Tere Daane, who was in the white Cherokee, Tere handed the officer "some papers that had names and dollar amounts written on them." The documents were affidavits made out to Murdock and signed by different individuals. Officer Howlett also observed a fax machine in Tere Daane's vehicle.

Officer Howlett retrieved an e-mail document from Tere Daane providing information on how to transfer one million dollars by wire.

Tere Daane told Officer Howlett, "she and the group of people had invested money with [Murdock], and that he had not been paying them, and he had been avoiding them, and they had to hunt him down like a rabbit."

Officer Alaniz also searched the white Jeep Cherokee, finding a .50 caliber handgun, a smaller caliber handgun, a radio battery charger, binoculars, a glass cutter, and clothing. The smaller handgun was found inside of a backpack in a holster, "with the lettering D-A-A-N-E written on it."

When Officer Peinado arrived, he noticed an unoccupied gray Suzuki with its headlights on and engine running. He entered the Suzuki and turned the engine off. When he searched the vehicle, he found a loaded .44 magnum handgun

in a black, plastic container underneath the driver's seat, and "a 380 caliber semiautomatic pistol" in the Suzuki's front console. The latter firearm was in a holster inside of a plastic bag.

In an interview with Officer Peinado, William Daane stated that "he had no idea" why the .380 caliber firearm was on the front console. He explained that the duct tape,[4] flex ties, and gloves in the car were for hunting, and that "he forgot he left guns in the car . . . ."

During an interview with Special Agent Roberts of the FBI, William Daane admitted that "he wanted to scare Les Murdock." William Daane also stated that, during the altercation, he warned Murdock "to settle down or he would have to hurt him." Daane denied any knowledge of how the flex ties "came to Pasadena."

William Daane gave Agent Roberts two different explanations for the presence of the firearms. He told Agent Roberts that he had packed them for an upcoming hunting trip, but had not packed any other supplies for the trip. He also told Agent Roberts "that the firearms were in his car because he had been busy and had forgotten to unpack his car because he had been shooting either the weekend, or perhaps two weekends, prior[.]"

Trent informed Agent Roberts that "he was the passenger in the blue Ford Taurus . . . and he was watching Mr. Murdock's car — trying to spot Mr. Murdock come back to the car." Trent stated that he approached Murdock and "tried to grab the phone out of Mr. Murdock's hand because he did not want Mr. Murdock to make a telephone call" and that he "began pulling Murdock from the car."

---

[4]This duct tape was not the same as the tape Stich put in the rental car.

With respect to the flex ties, Trent stated that he had seen the flex ties in the back seat of the Ford Taurus, but "didn't know how they got there." Trent also recounted that he moved the flex ties "from the back seat area to the front seat area so that if Mr. Murdock saw them he would not be scared."

Officer Finney searched a suitcase taken from the white Cherokee. Inside the suitcase, she found checks payable to Arn that were drawn on Murdock's account. She also found a passport in Arn's name and a spreadsheet listing amounts Murdock owed to numerous individuals, including appellants. The total amount listed on the spreadsheet was $1,750,330.27.

## D.  Jury Verdicts

The Daanes, Arn and Trent were convicted of conspiracy and attempted interference with commerce by threats and violence. Miller was convicted only on the conspiracy charge. Appellants filed timely notices of appeal.

## III.  Standards of Review

"We review the district court's determination that a factual foundation does not exist to support a jury instruction proposed by the defense for an abuse of discretion." *United States v. Castellanos-Garcia*, 270 F.3d 773, 775 (9th Cir. 2001) (citations omitted). "A court commits reversible error when it fails to instruct the jury as to a defense theory if the theory finds some basis in the record and is supported by law." *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1455 (9th Cir. 1986) (citations omitted).

## IV.  Discussion

Relying on *United States v. Enmons*, 410 U.S. 396 (1973), and *Scheidler v. National Organization For Women*, 537 U.S. 393 (2003), appellants argue that the district court erred when

it rejected their proffered "claim of right" instruction. In particular, appellants assert that they had a rightful claim to the funds in Murdock's possession and therefore their actions were not "wrongful" as required for extortion.

**[1]** However, neither *Enmons* nor *Scheidler* supports appellants' claim of right instruction. In *Enmons*, the Supreme Court specifically addressed "whether the Hobbs Act proscribes violence committed during a lawful strike for the purpose of inducing an employer's agreement to legitimate collective-bargaining demands." *Enmons*, 410 U.S. at 399. The Supreme Court observed that "[t]he legislative framework of the Hobbs Act . . . makes it clear that the Act does not apply to the use of force to achieve legitimate labor ends." *Id.* at 401. However, "when the objectives of the picketing changed from legitimate labor ends to personal payoffs, then the actions became extortionate." *Id.* at 406 n.16. *Enmons*, with its specific focus on labor disputes, undermines appellants' contention that a similar claim of right defense was applicable in their case. Tellingly, this court has previously declined to extend *Enmons* beyond the context of a labor dispute. *See United States v. Thordarson*, 646 F.2d 1323, 1326-27 (9th Cir. 1981) ("There is no basis in the [Supreme] Court's decision or its underlying rationale for the creation of an 'Enmons doctrine' of immunity applicable to all federal criminal statutes. We read Enmons as holding only that the use of violence to secure legitimate collective bargaining objectives is beyond the reach of the Hobbs Act.").

**[2]** Other circuits have reached the same conclusion. In *United States v. Zappola*, 677 F.2d 264 (2d Cir. 1982), the Second Circuit opined that a claim of right defense is unwarranted in cases involving the use of force. The Second Circuit distinguished *Enmons* as limited to cases involving legitimate labor strikes. *Id.* at 269. The Second Circuit clarified that:

> [B]y adopting the states' statutory law of extortion, Congress meant to punish as extortion any effort to

obtain property by inherently wrongful means, such as force or threats of force . . . , regardless of the defendant's claim of right to the property. . . . We agree with the other circuits that have addressed this issue that Enmons merely carved out a labor exception to the traditional law of extortion codified in the Hobbs Act.

*Id.* at 268-69 (citations omitted).

**[3]** Similarly, the Seventh Circuit in *United States v. Castor*, 937 F.2d 293 (7th Cir. 1991), held that the district court properly rejected the defendants' proffered instruction because, "[w]hatever the contours of [the claim of right] defense may be, they do not reach extortions based on threats of physical violence outside the labor context. [Y]ou cannot beat someone up to collect a debt, even if you believe he owes it to you." *Id.* at 299 (citation omitted).

Additionally, those decisions establishing a claim of right defense in cases involving threat of economic harm are inapposite. In *United States v. Sturm*, 870 F.2d 769 (1st Cir. 1989), the First Circuit held:

Although it may be appropriate not to recognize a claim of right defense in extortion cases based on the wrongful use of force or violence, different considerations apply in the context of extortion based on economic fear. Whereas the use of actual or threatened force or violence to obtain property is inherently wrongful, there is nothing inherently wrongful about the use of economic fear to obtain property.

*Id.* at 772-73 (citations omitted). Because this case involves the use of physical violence, not the threat of economic harm, the rationale of *Sturm* does not apply.

*Scheidler* is similarly inapposite. In *Scheidler*, the Supreme Court considered whether anti-abortion protesters, who

obstructed access to abortion clinics, "committed extortion within the meaning of the Hobbs Act." *Scheidler*, 537 U.S. at 397, 399. In holding that the protesters did not commit extortion, the Court focused on the fact that the protesters obtained no property from those whose access to abortion clinics was restricted. *Id.* at 397. In contrast, in this case, appellants attempted to take money from Murdock.

The Supreme Court's recent consideration of *Scheidler* in no way strengthens appellants' argument. In *Scheidler v. National Organization For Women*, 126 S.Ct. 1264, 1270 (2006), the Supreme Court held that "physical violence unrelated to robbery or extortion falls outside the scope of the Hobbs Act." *Id.* "Congress did not intend to create a freestanding physical violence offense in the Hobbs Act. It did intend to forbid acts or threats of physical violence in furtherance of a plan or purpose to engage in what the statute refers to as robbery or extortion (and related attempts or conspiracies)." *Id.* at 1274.

**[4]** The record in this case undeniably reveals that appellants used physical violence in their attempt to force Murdock to transfer funds to them. *Scheidler* therefore does not foreclose appellants' conviction.

**[5]** Although Arn, Tere Daane, Trent, Stich, and Miller invested only $375,062 with Murdock, they intended to force Murdock to transfer over $1,700,000. At a minimum, appellants failed to demonstrate that they had a legal right to funds in excess of those invested. Accordingly, any "claim of right" instruction was properly rejected by the district court.

## V.   Conclusion

The district court did not abuse its discretion in rejecting appellants' proffered "claim of right" instruction, because such an instruction was not supported by the law or the facts.

**AFFIRMED.**