UNITED STATES of America, Appellee,

v.

Jose TORMOS–VEGA, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Juan Luis BOSCIO, Defendant,
Appellant.

Nos. 88–2235, 89–1253 and 89–2022.

United States Court of Appeals,
First Circuit.

Jan. 21, 1992.

Rehearing and Rehearing En Banc
Denied March 18, 1992.

Harry Anduze Montano with whom Pia Gallegos, Santurce, P.R., was on brief, for appellant Jose Tormos–Vega.

Ricardo R. Pesquera, Asst. U.S. Atty., with whom Daniel F. Lopez–Romo, U.S. Atty., was on brief, for appellee U.S.

Juan Luis Boscio, on brief, pro se.

Before BREYER, Chief Judge, CAMPBELL and SELYA, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

At argument before us in April of 1990, the defendants/appellants presented numerous challenges to their district court convictions under the Hobbs Act, 18 U.S.C. § 1951. On September 5, 1990, without considering any of the other claims of error, we issued an order granting new trials because the jury had been empaneled by a magistrate, not an Article III judge, 912 F.2d 3 (1st Cir.1990). We stayed our mandate, however, because of the Supreme Court's grant of certiorari in two cases raising relevant refinements of the magistrate empanelment issue. *See United States v. France,* —— U.S. ——, 111 S.Ct. 805, 112 L.Ed.2d 836 (1991); *Peretz v. United States,* —— U.S. ——, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991). On September 19, 1991, pursuant to the Court's *Peretz* decision, we withdrew our order of September 5, 1990 granting a new trial. We proceed now to consider and decide the other claims of error previously briefed and argued by the defendants. Finding no reversible error, we affirm both convictions.

## I.

On October 31, 1985, a federal grand jury returned a three-count indictment against Jose Tormos Vega, the mayor of Ponce, Puerto Rico; Juan Luis Boscio, the president of the board of directors of the Ponce Municipal Development Authority (PMDA); and Miguel A. Serrano, a senior vice president of Shearson American Express Puerto Rico (Shearson). Count One charged that the three defendants, together with Irding Chardon de Tormos (Tormos Vega's wife) and other parties, had conspired to obstruct, delay and affect commerce by extortion under color of official right, in violation of 18 U.S.C. § 1951. Count One alleged that the conspiracy occurred from on or about June 6, 1983 to on or about August 29, 1983, and that "[i]t was part of said conspiracy that [Tormos Vega and Boscio] would obtain and did obtain [$110,000] each ... which was induced by extortion under color of official right." Count One further alleged that "[t]his payment would ensure that [Serrano] would retain the account of PMDA at [Shearson]" and that "it was part of said conspiracy that defendant [Serrano] would and did obtain a [$660,000] payment from the account of PMDA at [Shearson]." Count Two charged that defendants Tormos Vega and Boscio had wrongfully obtained $120,000 from Serrano under color of official right, and Count Three charged that defendant Boscio had wrongfully obtained $100,000 from Serrano, both in violation of 18 U.S.C. § 1951(b)(2) and affecting commerce under § 1951(b)(3).

Prior to the return of the indictment, Serrano, under a grant of immunity, had testified about the incidents alleged in the indictment before the Puerto Rico House of Representatives. Finding that the government had improperly used Serrano's immunized testimony against him, the court dismissed the indictment as against Serrano. The case against Tormos Vega and Boscio was tried beginning on May 27, 1988.

Serrano testified that, in April or May 1983, he was under pressure from his superiors at Shearson[1] to sell several mortgages that had recently been purchased by Shearson. Serrano decided to try to sell the mortgages to the PMDA. Serrano called Boscio and proposed that PMDA purchase the mortgages together with other Shearson financial products it had already agreed to purchase, for a total price of $66 million. Boscio asked "how much is in it for me?", and Serrano responded that, if Serrano were awarded a 1% commission ($660,000), he would pay Boscio and Tormos Vega $110,000 each, keep $110,000 for himself, and use the remaining $330,000 to pay taxes.

On June 6, 1983, before he had received any money from Serrano, Boscio stated to Serrano "the mayor wants his money now. He needs it now and he wants to see it." Although he initially responded that he could not pay because he had not yet received his $660,000 commission, Serrano wrote a check for $120,000 on his personal account with Shearson, and sent that check to a bank called Home Federal Savings and Loan (Home Federal). Serrano intended that $110,000 go to Tormos Vega to fulfill the original agreement, and that the remaining $10,000 go to Boscio in partial fulfillment of the agreement. Serrano called Jaime Newton Davila, Home Federal's president, instructing him to cash the check and give 120 money orders for $1,000 each to Boscio. Davila testified that he complied with these instructions and gave Boscio 120 blank money orders.

The following day (June 7, 1983), according to Serrano's testimony, a meeting was held in the Condado Holiday Inn, in San Juan. Present were Serrano, Boscio, Davila, Augusto Zayas Cintron, executive director of the PMDA, and other representatives of Shearson. Tormos Vega was not present. At that meeting Serrano drafted two letters on PMDA stationery. The first, addressed to Serrano, stated that "as per [the mayor's] instructions" Serrano

---

**1.** Serrano had requested a leave of absence from Shearson, but the evidence at trial did not clearly establish whether Serrano continued to serve as an officer of Shearson during the relevant time period.

was to debit $660,000 from PMDA's account with Shearson and credit that amount to Home Federal's account with Shearson. The second, addressed to Davila, instructed Home Federal to transfer the funds from its Shearson account to an account maintained at Home Federal by Ponce Developers, a corporation controlled by Serrano. After Serrano drafted the letters, Zayas signed them both.

After the funds were deposited into Ponce Developers' account, Boscio visited Serrano's offices and requested an invoice in order to justify the $660,000 transaction on PMDA's books. Serrano prepared an invoice and gave it to Boscio. A week later Serrano instructed Home Federal to debit his account $600,000, transfer $500,000 to another bank, and issue him a certificate of deposit for $100,000.

Thus, according to Serrano's testimony, the transaction had proceeded smoothly up to this point. However, between June 17 and 19, 1983 Shearson received a letter from Tormos Vega purporting to revoke his authorization of the entire $66 million transaction. Believing that Boscio had not given Tormos Vega the $110,000, Serrano called Boscio. Boscio responded that he would "talk to the mayor and fix everything up." Serrano decided to withhold Boscio's $100,000, sent a note to the mayor reminding him of the agreement, and then went to Tormos Vega's home to ask for an explanation. Tormos Vega told Serrano that he had sent the letter in order to exert pressure on Shearson to approve another pending transaction with the city. Serrano did not ask Tormos Vega whether he had received the $110,000, believing that the mayor would be embarrassed by such a question. Shortly after this meeting between Tormos Vega and Serrano, Tormos Vega and a Shearson official signed an agreement wherein Tormos Vega ratified the $66 million transaction. The transaction having been successfully completed, Serrano again telephoned Davila at Home Federal and instructed him to turn over 100 money orders for $1,000 each to Boscio, which Boscio in turn picked up.

About a year later the Treasury Department and the House of Representatives of Puerto Rico began investigating transactions between the government of Ponce and Shearson. Around September 7, 1984, Serrano, then staying at his parents' house in Florida, received a call from Boscio. Boscio stated that he was also in Florida, at Tormos Vega's home there, and that he and Tormos Vega would like to meet with Serrano. The three met later that day at a shopping mall in Orlando, and both Tormos Vega and Boscio suggested to Serrano ways they might cover up the payments to Tormos Vega. They suggested either simulating jewelry sales or having Tormos Vega sign notes of indebtedness to Serrano so that the payments would appear to be a loan. Serrano rejected these proposals but agreed to meet with Tormos Vega at the latter's home. At that meeting, on September 11, 1984, Serrano informed Tormos Vega that he had been approached by members of the Puerto Rico House of Representatives offering immunity from prosecution in return for his testimony, and suggested that Tormos Vega also seek immunity from that body. Tormos Vega refused, and, as Serrano left, Tormos Vega handed him photocopies of notes indicating a debt from Tormos Vega to Serrano.

The government presented the testimony of several additional witnesses in an attempt to corroborate Serrano's story. Among these witnesses was Raul Rodriguez, manager of the Banco Popular branch in Ponce Plaza. Rodriguez testified that Tormos Vega called him the morning of June 16, 1983 and asked him to stop by Tormos Vega's home before going to work. When Rodriguez arrived at Tormos Vega's home, Tormos Vega said he had recently sold some land in the Dominican Republic and asked Rodriguez to cash some money orders he had received as payment. Rodriguez agreed, and Tormos Vega handed him a paper bag containing several money orders. When Rodriguez arrived at his office, he found that the bag contained 50 money orders for $1,000 each, none of which had been endorsed. After several unsuccessful attempts to reach Tormos Vega, Rodriguez, noting that the money

orders were payable to the bearer, decided to endorse them with fictitious names. Rodriguez then cashed the checks and delivered a paper bag containing $50,000 in cash to Tormos Vega. Rodriguez informed Tormos Vega that he had endorsed the checks with fictitious names, to which Tormos Vega did not reply. The following day, Tormos Vega again asked Rodriguez to come to his home before work. Rodriguez was given a paper bag containing 25 money orders for $1,000 each, all of which had previously been endorsed. Rodriguez cashed these money orders and gave Tormos Vega's son a paper bag containing $25,000 cash. Further testimony was presented indicating that Tormos Vega had traveled to Jacksonville, Florida to cash an additional $28,000 in money orders, and that he had given $7,000 in money orders to several associates as loans, making a total of $110,000 in money orders cashed by Tormos Vega.

## II.

The defendants allege a number of errors. We consider each allegation in turn, and, finding no reversible error, affirm the convictions.

### A. *Source of Funds*

■ Boscio makes various arguments based upon his attempts to prove that the money he received from Serrano constituted payment for legal services (Boscio is an attorney) in an unrelated matter. Referred to by the parties as the "Universal Tank transaction," this other matter was allegedly active around the same time that Ser-

rano received the $660,000 commission. Boscio claims that, by the time he received the money orders, Serrano had transferred the $660,000 commission out of Ponce Developers' account at Home Federal and deposited therein approximately $422,000 in proceeds from the Universal Tank transaction. Furthermore, according to Boscio, Serrano used part of the $660,000 to purchase a certificate of deposit which did not mature until September 15, 1983, three weeks after he received the money orders. Boscio would have us deduce that he was paid out of the proceeds of the Universal Tank transaction, not from Serrano's commission.

Boscio claims that the government interfered with his ability to present evidence as to the source of payments, thereby committing due process and Jencks Act violations. He further claims that the district court erred in denying his motion for a new trial based upon the discovery of new evidence that would allegedly have helped him establish the source of payments.[2] Because the immediate source of the funds used to pay Boscio was not a critical issue, we find no merit in these arguments. *See United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (*Brady* due process violation occurs only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"); *United States v. Izzi,* 613 F.2d 1205, 1212 (1st Cir.1980) ("our approach [to Jencks Act claims] has been to determine whether the defendant has been prejudiced by the government's [negligent] failure to

2. Specifically, Boscio claims that, first, the government violated the doctrine of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) by failing to turn over certain of Ponce Developer's bank statements and a certificate of deposit purchased by Serrano from Home Federal, which would have helped establish the source of the payments. (The government turned over the statements dated June 30, 1983 and August 31, 1983, but Boscio alleges that page two was missing from the June statement and that the government should have turned over the July statement). Second, the government violated due process of law "by presenting false evidence and perjured testimony," apparently because the government disa-

greed with Boscio's view of the relevance of the Universal Tank transaction. Third, the government failed to turn over Jencks Act material that would have helped him cross-examine one Rosario Camacho, a Home Federal branch manager, about the movement of funds in and out of the account. (The government claims it did turn over the material.) Fourth, the district court erred in denying a new trial based on newly discovered evidence concerning Camacho's testimony. The motion for a new trial was considered by the district court which, after considering "particularly the transcript of the trial testimony of the government's witness Rosario Camacho," denied the motion.

disclose"); *United States v. Benavente Gomez*, 921 F.2d 378, 382 (1st Cir.1990) (granting of new trial based on newly discovered evidence committed to sound discretion of district court; new trial should be granted only where new evidence would probably result in acquittal).

The heart of the prosecution was simply that Boscio had "obtain[ed] ... property [from Serrano] ... under color of official right." Which pocket of Serrano's the money came from was not itself an essential issue. Indeed, the government presented evidence that the first $120,000 payment ($110,000 for Tormos Vega and $10,000 for Boscio) came, not out of the $660,000 commission, but out of Serrano's personal account. The prosecution sought to prove its case by showing that Boscio (1) when presented with Serrano's proposal asked how much was in it for him; (2) agreed with Serrano to approve the deal in return for $110,000; and (3) later received $110,000. The only relevance of the Universal Tank transaction from Boscio's perspective was to bolster his contention that Serrano's real reason for paying him $110,-000 was for his legal services in the Universal Tank matter. Only to the degree the source of the funds bolstered the latter contention was it particularly material; assuming the jury believed the funds were paid for the corrupt purpose to which Serrano testified, the precise source was of little consequence.

Even assuming the funds' source had some relevance, Boscio does not explain how the government's alleged withholding of evidence, or the lack of the later discovered evidence, prevented him at trial from presenting this aspect of his defense. Nothing prevented Boscio from summonsing bank statements and other evidence material to identify the sources of funds in the various accounts. Being familiar with his own role as attorney and his relationship with Serrano and the others, Boscio was well able himself to know what evidence he wanted and to go after it before or at trial.

**B.** *The Jury Instructions*

Both defendants allege errors in the jury instructions. We consider each allegation in turn.

1. Wrongful Use

■ The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced ... under color of official right." 18 U.S.C. § 1951(b)(2). Tormos Vega argues that the court left out a necessary state of mind element in explaining this definition to the jury. The court instructed the jury that, in order to convict, it had to find that the defendants made "wrongful use of their offices," and that such wrongful use would exist if the defendants used their offices to "obtain[ ] property from a person to which [they had] no lawful claim." Tormos Vega argues that this instruction was error because it required only that he not have a claim to the property, without requiring his *knowledge* that he have no such claim. Acknowledging that he did not object to this instruction, Tormos Vega claims that it constituted "plain error" and can therefore be reviewed as such for the first time on appeal.

Tormos Vega's argument relies entirely on *United States v. Sturm*, 870 F.2d 769 (1st Cir.1989), a case in which this court vacated a Hobbs Act conviction for failure properly to instruct the jury on mens rea. In *Sturm* the defendant's airplane had been repossessed by a bank, but the defendant retained the flight logs. When the bank asked for the flight logs (without which, because of FAA regulations, the plane's value was lower), the defendant asked for $20,000 in return. In a subsequent Hobbs Act prosecution, the district court charged the jury that " '[w]rongful ... means that the Defendant had no lawful right to the property that he sought to obtain.' " *Id.* at 775. Although there had been no objection to this instruction, this court found plain error, in part because "[b]y making no reference to the defendant's state of mind, th[is] instruction suggested that [the defendant's] mens rea was irrelevant." *Id.*

However, this particular instruction was not the sole reason we found plain error in *Sturm*. In addition to giving this "claim to property" instruction, the court read a general charge that " '[t]he government is not required to provide, however, evidence that the Defendant knew those intentional acts were themselves illegal.' " *Id.* This court was concerned that this charge, when considered in conjunction with the "claim to property" instruction, might lead the jury to believe that criminal intent was not required. Moreover, the jury instructions had omitted any general reference whatever to criminal intent. We, therefore, specifically distinguished an earlier case where a district court had given a similar "claim to property" instruction but made clear, in a separate part of the instruction, that criminal intent was required. *See id.* at n. 7 (noting that, in *United States v. Kattar*, 840 F.2d 118, 124 n. 4 (1st Cir.1988), the jury was instructed that "it would have to find that the defendant intended 'to do something forbidden by [the] law.' (Citations omitted). There was no comparable jury instruction in this case.") *Cf. United States v. Boylan*, 898 F.2d 230 (1st Cir. 1990) (rejecting a mens rea challenge to a Hobbs Act instruction because the court gave a general instruction defining "knowingly" and "willfully" and then used those terms in its wrongfulness instruction). Noting the cumulative effect of all three of these problems, we found plain error in the jury instructions because they would have permitted the jury to convict even if it "found credible [the defendant's] claim that he sincerely believed that he was legally entitled to [the property]." *Sturm*, 870 F.2d at 775.

Although the "claim to property" instruction in *Sturm* was similar to that given in this case, we hold that, because of differences in both the facts and the other portions of the jury instructions, plain error did not occur here. Jury instructions are to be considered "in the context of the charge as a whole, not in isolation." *Boy-*

*lan*, 898 F.2d at 244; *United States v. Cintolo*, 818 F.2d 980, 1003 (1st Cir.1987). In this case, although the specific "claim to property" instruction was similar to that in *Sturm*, the charge as a whole did not convey the sense that no criminal intent was required. In fact, the district court gave a general charge, similar to that given in *Kattar*, that "the government must proof [sic] that the defendants knowingly did an act which the law forbids, and that they purposely intended to violate the law." Moreover, unlike the *Sturm* court, the district court here did not give a general instruction on ignorance of the law which could have led the jury to believe that no criminal intent was required.

The facts of this case, of course, differ dramatically from those in *Sturm*. In *Sturm*, because the defendant had once owned, and possibly still owned, the property at issue, he might genuinely have believed that he was entitled to withhold and bargain with the property at issue. Lacking an appropriate mens rea instruction, the jury might have convicted even though finding Sturm to have lacked criminal intent. No similar risk appears here. Tormos Vega was not paid in return for some piece of property he had once owned and might have thought he still had a claim to. Instead, he was paid for his official approval of a municipal contract after he had demanded some form of reimbursement. The money changed hands in the form of money orders of small denominations and was converted into cash using fictitious names. Tormos Vega does not point to any evidence from which the jury could have concluded that he thought he was entitled to the money; indeed, evidence was presented that Tormos Vega later suggested ways of covering up the transaction. Given these circumstances, and given the reference to mens rea in the charge as a whole, we do not think the failure to mention mens rea in the wrongfulness instruction constituted "plain error." [3]

---

**3.** As we find that the jury instructions adequately pointed out to the jury the mens rea element of the crime, we reject Boscio's related argument that the court erred in refusing to give his requested instruction to this effect. The instruction requested by Boscio was substantially cov-

## 2. Active Inducement

■ Tormos Vega contends that the district court erred because it refused to give a requested jury instruction concerning "inducement" under the Hobbs Act. This argument rests on recent cases holding that the Hobbs Act preserves the distinction between extortion and bribery. Before 1984 it was generally accepted that a Hobbs Act conviction of a government official required only proof that the payee accepted funds knowing that the payment was made for the purpose of influencing the payee's actions. However, in 1984 the Second Circuit held, en banc, that "some affirmative act of inducement by the official had to be shown to prove the Government's case." *See McCormick v. United States*, — U.S. —, 111 S.Ct. 1807, 1813 n. 5, 114 L.Ed.2d 307 (1991) (discussing *United States v. O'Grady*, 742 F.2d 682 (2d Cir.1984) (en banc) and noting conflict among circuits).

This circuit has yet to pass on the *O'Grady* analysis, since district judges in this circuit, in cases so far reviewed, have all tended to shape their jury instructions in accordance with the active inducement theory endorsed in *O'Grady*. *See Boylan*, 898 F.2d at 252; *United States v. Jarabek*, 726 F.2d 889, 904 n. 16 (1st Cir.1984). That was true of the charge here also. While the district court refused to give Tormos Vega's particular variant of the *O'Grady* charge, its own instructions were consistent with the central premise of *O'Grady*.[4]

Tormos Vega requested the following instruction:

> If you find that Mr. Tormos did not induced [sic], solicited [sic], or in any way requested [sic] from Mr. Serrano any payment in order to wrongfully use his position as mayor then you must find Mr. Tormos not guilty.

While declining this, the district court charged instead as follows:

> the government must proof [sic].... [t]hat the defendants knowingly and willfully *induced or attempted to induce their victim to part with property*.... *[T]he mere acceptance of money by a public official is not sufficient to convict him of the crime of extortion under color of official right.* Mere acceptance of money by a public official is not sufficient to convict him of the crime of extortion under color of official right.
>
> In order to establish the commission of the crime of extortion under color of official right the government must proof [sic] beyond a reasonable doubt that the defendants made wrongful use of their offices in such a way as to *induce payments* of $110,000 to each of them by Miguel Arreche Serrano. It is a wrongful use of an otherwise valid power that converts dutiful action into extortion.
>
> Extortion under color of official right occurs when a public official through the wrongful use of his office obtains property that is not due to him or his office.

This charge plainly told the jury that to convict it had to find that defendants, including Tormos Vega, knowingly and willfully induced or attempted to induce Serrano to give them money. Its message was little different from the proposed charge. *See United States v. Perkins*, 926 F.2d 1271, 1283 (1st Cir.1991) (no reversible error if requested charge substantially covered by charge given). The only differences

---

ered by the charge given. *See United States v. Perkins*, 926 F.2d 1271, 1283 (1st Cir.1991) (no reversible error if requested charge substantially covered by charge given).

**4.** It is worth pointing out that the *O'Grady* court was concerned with a situation far different from that at issue here. In *O'Grady*, a New York City official had received numerous "meals, trips and other entertainment" from vendors seeking to do business with his agency. 742 F.2d at 685. There was evidence that these benefits were conferred on the defendant as part of the vendors' routine "company policy to entertain customers," and that their cost was deducted from the vendors' taxable income. *Id.* The court was concerned that a conviction in that case, without a clear showing that the public official used his office to induce the benefits, would turn the Hobbs Act into " 'a code of integrity for public officials.' " *Id.* at 694 (citation omitted). Needless to say, the facts here are far different. Instead of routinely receiving certain gifts, Tormos Vega and Boscio were alleged to have received $220,000 cash in return for their approval of a specific transaction.

between this charge and the one requested by Tormos Vega are that the former put the proposition in the positive (stating that the defendants could be convicted on certain findings), instead of in the negative (stating that they could not be convicted on the opposite findings), and that it omitted the terms "solicit" and "request," relying entirely on the term "induce." We think these differences did not alter its basic message.

Tormos Vega argues that alternative verbs such as "solicit" and "request" were needed to flesh out "induce"—a more colorless term not generally used in common speech. "Induce," however, is the term Congress used in defining Hobbs Act extortion. 18 U.S.C. § 1951(b)(2). We believe that a reasonable jury would understand the meaning of that term as used in the instruction, especially since the court also emphasized that "mere acceptance" was not enough.

■ Tormos Vega also argues that the court gave a conflicting charge, when it later stated, in the last paragraph quoted above, that "[e]xtortion ... occurs when a public official through the wrongful use of his office *obtains* property." (Emphasis added). Tormos Vega contends that someone can "obtain" property passively and without any effort, so that this portion of the charge would allow the jury to convict even if it did not find active inducement by Tormos Vega. We disagree. The term "obtain" means "to gain or attain possession or disposal of [usually] by *some planned action or method.*" Webster's Third New International Dictionary (1971). Thus, the term may in fact suggest some planned action on the part of the obtainer. Here, moreover, the term was used only after the court had stated both that "mere acceptance" was not enough and that "inducement" was required. We accordingly reject Tormos Vega's argument.

3. Interstate Commerce

■ Tormos Vega contends that the court erred in its jury charge on the interstate commerce element of the Hobbs Act. The Act requires a finding, beyond a rea-

sonable doubt, that the defendant "in any way or degree obstructs, delays, or affects commerce." 18 U.S.C. § 1951. The district court instructed the jury that

[t]he government must show beyond a reasonable doubt that interstate commerce was delayed, obstructed or affected in any way or degree by the acts charged in the indictment. . . .

The presence of interstate commerce is one of the elements of the offenses charged in the indictment. The element is satisfied if you find beyond a reasonable doubt (1) that the [PMDA, Shearson or Home Federal] at the times relevant to the case were corporations engaged in interstate commerce, and (2) that the transaction between these entities took place as charged in the indictment.

It is not necessary, members of the jury, for the government to show that the defendants actually intended to delay, to obstruct, or to affect interstate commerce. Nor is it of any consequence if the defendants were totally ignorant of any effect which the alleged extortion had on interstate commerce.

Therefore, the government need not show that Mr. Tormos and Boscio set out with a specific conscious purpose or a desire to obstruct, to delay, or to affect commerce. It is only necessary for the government to prove that the *defendants, Tormos and Boscio, embarked on a course of behavior likely to have a natural effect on commerce.* (emphasis added).

Tormos Vega protests the second paragraph of this instruction, as it permits the jury to convict merely if PMDA, Shearson or Home Federal were found to have engaged in interstate commerce and if the transactions between them "took place as charged in the indictment." Pointing out that the issue was not simply whether *Shearson or PMDA* were engaged in interstate commerce, Tormos Vega argues that the jury should have been told to convict only if the allegedly extortionate transaction between individuals (Serrano, Tormos Vega and Boscio) could have affected commerce. *See United States v. Jarabek*, 726

F.2d 889, 901 (1st Cir.1984) (Hobbs Act requires a " 'realistic probability that extortionate *transaction* will have some effect on interstate commerce' ") (quoting *United States v. DiGregorio*, 605 F.2d 1184, 1190 (1st Cir.), *cert. denied*, 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979)) (quoting *United States v. Hathaway*, 534 F.2d 386, 396 (1st Cir.), *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976)) (emphasis added). Although the individuals allegedly involved in the extortion were affiliated with PMDA, Shearson and Home Federal, the extortionate transaction took place between individuals, not those entities. Thus, the charge's reference to "the transaction between these entities" was misplaced. Moreover, Tormos Vega claims that an extortionate transaction involving parties affiliated with entities engaging in commerce does not necessarily affect commerce. *See United States v. Lewis*, 671 F.2d 1025 (7th Cir.1982) (extortion of employee of corporation engaging in interstate commerce had no effect on such commerce).

We agree with Tormos Vega that the mentioned language in the second paragraph above did not, standing alone, sufficiently convey to the jury, as it should have, that the extortion itself had to affect commerce. Jury instructions, however, are to be considered "in the context of the charge as a whole, not in isolation." *Boylan*, 898 F.2d at 244; *United States v. Cintolo*, 818 F.2d 980, 1003 (1st Cir.1987). The court charged in the preceding paragraph that the government must show beyond a reasonable doubt "that the interstate commerce was delayed, obstructed or affected ... by the acts charged in the indictment." The court went on to say in the fourth paragraph that "the government [must] prove that the defendants, Tormos and Boscio, embarked on a course of behavior likely to have a natural affect on commerce." Thus the court twice indicated to the jury that the extortion itself had to affect commerce.

Moreover, the test the court described in the second paragraph, while theoretically off the mark, was, as a practical matter, consistent with a proper understanding of the commerce element. The commerce element may be satisfied where "threatened or potential effects [on commerce] never materialize because extortionate demands are met" or where the extortion has a "beneficial effect on interstate commerce." *United States v. Mattson*, 671 F.2d 1020 (7th Cir.1982). Thus, the court correctly conveyed that "whether the transaction between [PMDA and Shearson] ... took place as charged in the indictment" was of key significance. The transaction set out in the indictment between Shearson and PMDA was a $66 million transaction between a division of a multi-national investment firm and a municipal government in Puerto Rico. To find this transaction "took place *as charged*," the jury had to find that it occurred only because Serrano acquiesced in defendants' extortionate demands. Such a finding pointed inexorably to the conclusion that the extortion affected commerce: it facilitated a multi-million dollar transaction which plainly had an effect on interstate commerce.[5] Thus the matters described by the court were, as a practical matter, central to a proper evaluation of the interstate commerce element of the offense. For that reason, and because the charge before and after did, in fact, focus the jury's attention on the requirement that the extortionate transaction between individuals must affect commerce, we hold that the challenged remarks did not constitute reversible error.

### 4. *Conspiracy*

■ Tormos Vega argues that the district court erred in instructing the jury that the defendants were charged with conspiracy under the general conspiracy statute, 18 U.S.C. § 371, rather than the Hobbs Act, 18 U.S.C. § 1951. The indictment charged the defendants with conspiracy to "obstruct, delay and affect commerce ... in violation of Title 18, United States Code, Section 1951." At the beginning of the

---

**5.** As there was ample evidence that this in fact occurred, we reject Tormos Vega's argument that there was insufficient evidence for the jury to find that the commerce element was satisfied.

jury charge, the court made an introductory statement that "the United States has charged the defendants with one count of conspiring to obstruct, delay and affect commerce by means of extortion under color of official right," substantially tracking the language of 18 U.S.C. § 1951.[6] However, when the court later read a detailed charge on the conspiracy count, it stated that

the statute that is relevant for the conspiracy count ... is Section 371 of Title 18 of the United States Code, which provides in part as follows:

If two or more persons conspire to commit any offense against the United States, and one or more of such persons does any act to effect the object of the conspiracy, each is guilty of an offense against the United States.

The court went on to explain in detail the elements of 18 U.S.C. § 371, including the requirement that the defendants commit an overt act.

Tormos Vega did not object to this instruction, but claims that it constituted plain error which may be noticed for the first time on appeal. This is a difficult standard to meet: "the plain error exception is to be used 'sparingly,' only to prevent justice from miscarrying." *United States v. Hunnewell*, 891 F.2d 955, 956 (1st Cir.1989) (quoting *United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982)). *See also United States v. Young*, 470 U.S. 1, 16, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (plain errors are those which "undermine the fundamental fairness of the trial").

In support of his argument, Tormos Vega points to *United States v. Aguon*, 851 F.2d 1158 (9th Cir.1988) (en banc). In *Aguon*, the defendant had been charged with conspiracy to commit extortion under 18 U.S.C. § 1951 as well as mail fraud and conspiracy to obstruct justice. The district court gave a general conspiracy instruction under 18 U.S.C. § 371 which allowed the jury to convict for conspiracy to commit

extortion or mail fraud, or to obstruct justice, if the elements of § 371 were satisfied. Although the defendant had not objected to the instruction at trial, the court found the instruction to be plain error for two reasons. First, "[c]onspiracy to obstruct justice and conspiracy to commit mail fraud were treated as identical with conspiracy to extort, as though all three crimes of conspiracy were offenses under 18 U.S.C. § 371." 851 F.2d at 1169. The latter was not the case, of course, as conspiracy to extort is a crime under § 1951, but the statutes defining mail fraud and obstruction of justice do not contain individual conspiracy provisions, and conspiracy to commit these offenses is only a crime under § 371. Second, the court was concerned that the conspiracy conviction may have been tainted by a potential "spillover" from the district court's erroneous instruction with respect to the substantive extortion count. Those instructions had omitted the mens rea element. Thus, the jury may have convicted on the extortion count without finding the requisite criminal intent, and "concluded that the extortion ... was evidence of [the defendant's] participation in the conspiracy," even though it may not have been convinced of criminal intent on either charge. *Id.*

Neither of these two problems is present in this case. First, there is no potential "spillover," as the extortion instructions themselves were correct. *See supra.* Second, unlike *Aguon*, extortion was the only substantive crime charged. Thus, there was no risk here that the jury would confuse conspiracy to commit extortion, a specific crime defined at 18 U.S.C. § 1951, with a general conspiracy under 18 U.S.C. § 371 to commit some other offense. To be sure, the district court erred, technically, in referring to § 371, but we do not think that error "undermine[d] the fundamental fairness of the trial." *Young*, 470 U.S. at 16, 105 S.Ct. at 1046. Tormos Vega does not explain how a conspiracy instruction given pursuant to § 1951 would have differed from setting forth the elements of

**6.** The Hobbs Act provides that "[w]hoever in any way or degree obstructs, delays or affects commerce ... by robbery or extortion or at-

tempts or conspires so to do" is guilty of a crime. 18 U.S.C. § 1951.

extortion under § 1951 and then giving a general conspiracy charge under § 371, as was done here. Indeed, the only difference that we can discern is favorable to Tormos Vega; § 1951 does not require proof of an overt act in furtherance of the conspiracy, *see Ladner v. United States*, 168 F.2d 771 (5th Cir.), *cert. denied*, 335 U.S. 827, 69 S.Ct. 53, 93 L.Ed. 381 (1948), whereas § 371—and the district court's instructions in this case—do require proof of an overt act.

C. *Variance*

Both Tormos Vega and Boscio argue that the evidence presented at trial unlawfully varied from the facts alleged in the indictment.

■ "Variance occurs when the facts proved at trial are different than those alleged in the indictment." *United States v. Flaherty*, 668 F.2d 566, 582 (1st Cir. 1981). However, the mere fact of variance is not grounds for reversal; in order to reverse a conviction, a court must find that the variance affected the defendant's "substantial rights." *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935). The "substantial rights" protected by this rule are that the defendant have sufficient knowledge of the charge against him in order to prepare an effective defense and avoid surprise at trial, and to prevent a second prosecution for the same offense. *Id.* The doctrine of variance also protects against prejudicial "spillover", so that in cases with multiple defendants proof that one defendant was involved in one conspiracy does not lead the jury to believe that another defendant was involved in a separate conspiracy. *Flaherty*, 668 F.2d at 582 (citing *United States v. Toliver*, 541 F.2d 958, 962–63 (2d Cir.1976)).

■ Tormos Vega's first claim of variance concerns the evidence of the meeting between Tormos Vega, Boscio and Serrano in Florida, at which they discussed covering up the earlier transactions. When Serrano began to testify about the meeting, Tormos Vega's counsel objected on the ground that evidence of the meeting tended to show another conspiracy—to cover up the earlier

transaction—that had not been alleged in the indictment. After hearing Serrano's testimony outside of the presence of the jury and considering the argument, the court ruled that the evidence was directly relevant to the charge that Tormos Vega had participated in the original conspiracy. The court therefore allowed the evidence for that limited purpose. When Serrano later mentioned the term "conspire" in describing the meeting, the court instructed the jury that "the characterization made by Mr. Serrano that 'we are conspiring' is stricken from the record and it is not to be taken by you in any way.... [H]is statements as to that meeting, if they are considered by you in any way, shall be considered only with reference to the events of June through August 1983, which are alleged. I repeat, there is no evidence and no charge of any conspiracy in September '84."

Under these circumstances, admission of this evidence clearly did not constitute a variance. That Tormos Vega met with Boscio and Serrano to cover up the original transaction confirmed Tormos Vega's participation in that earlier event as charged in the indictment. If he had not participated, he would have had little reason to try to cover it up. Admitted as further evidence of the occurrence of acts alleged in the indictment, the evidence did not amount to a variance.

■ We add that even if the admission of this evidence is regarded as a variance, it would not have affected Tormos Vega's substantial rights. Tormos Vega does not claim that he was surprised by Serrano's testimony concerning the Florida meeting. The government had indicated in a pretrial memorandum submitted to the district court that it would present this evidence. When the evidence was ultimately presented, Tormos Vega did not object on the grounds of surprise; on the contrary, the record indicates that he was prepared to confront it. Moreover, the jury was specifically instructed not to consider this evidence as probative of a second conspiracy. The clarification obviated any im-

proper "spillover" or risk of subsequent prosecution for the same offense.[7]

■ Tormos Vega's second variance argument is that the means of the extortion proven at trial were different from those alleged in the indictment. Tormos Vega claims the indictment alleged that he demanded money from Serrano in order to "ensure" that PMDA's account would remain at Shearson, but that the evidence at trial showed that the reason Serrano paid him the money was in order to ensure that Serrano received a commission for himself.

Tormos Vega's argument only applies to Count One of the indictment, the conspiracy count. Count Two of the indictment, which charges Tormos Vega with extortion, does not mention Serrano's reason for making the payment. Count One, charging conspiracy, reads in relevant part as follows:

> the defendants ... conspired ... to obstruct, delay and affect commerce ... by extortion under color of official right, as that term is defined in Section 1951 of Title 18, United States Code.
>
> 3. It was part of said conspiracy that defendants JOSE TORMOS VEGA and JUAN LUIS BOSCIO would obtain and did obtain [$110,000 each] which was induced by extortion under color of official right. This payment would *ensure that MIGUEL A. SERRANO, Senior Vice President of [Shearson] would retain the account of PMDA at [Shearson].*
>
> 4. It was part of said conspiracy that defendant *MIGUEL A. SERRANO would and did obtain a [$660,000] payment* from the account of PMDA at [Shearson].

Count One continued with a section entitled "Overt Acts" which discussed in more detail how the alleged extortion was carried out. This section contained several references to Serrano's $660,000 commission.

For Tormos Vega's argument to succeed, we would have to find that the conspiracy count alleges that the only reason for Serrano's payment was his desire to retain the PMDA account at Shearson, and that Serrano's self-interested desire to receive a commission personally was not also alleged as a reason for the payment. The indictment, obviously, does not support such a construction. To be sure, in mentioning the retention of the PMDA account, the indictment stated that the extortion payment would "ensure" that Serrano "retain" that account. But the conspiracy count also mentioned the $660,000 commission, alleging "it was part of said conspiracy" that Serrano would and did obtain the commission. Moreover, the $660,000 payment was referred to repeatedly in the part of Count One listing overt acts in furtherance of the conspiracy. There was plainly no variance.

■ Indeed, even assuming a variance, there was no infringement of Tormos Vega's substantial rights. The indictment repeatedly mentioned the commission, and Tormos Vega could not possibly have been surprised by evidence that he had used Serrano's desire to obtain a commission in order to extort money from him.[8]

---

7. We also reject Tormos Vega's argument to the extent it is based on the Federal Rules of Evidence. The evidence was highly probative, and its probative value would not have been "substantially outweighed" by any prejudice. *See* Fed.R.Evid. 403.

8. Tormos Vega's reliance on *United States v. Cusmano,* 659 F.2d 714 (6th Cir.1981), is misplaced. In *Cusmano,* a Hobbs Act prosecution, the indictment had alleged that the means of the extortion was to induce fear of economic loss. The court reversed the conviction because the evidence *and jury charge* amounted to an amendment of the indictment, permitting the jury to convict if it found that the means of the extortion was to induce fear of physical vio-

lence. Although amendment of an indictment, unlike factual variance, requires per se reversal, *United States v. Baytank (Houston), Inc.,* 934 F.2d 599, 606 (5th Cir.1991), *Cusmano* found an amendment only because the court's jury charge would have permitted conviction on a fundamentally different basis from that alleged in the indictment. Here the jury charge on the conspiracy count mirrored the language of the indictment. *See United States v. Iozzi,* 420 F.2d 512, 515–16 (4th Cir.1970), *cert. denied,* 402 U.S. 943, 91 S.Ct. 1607, 29 L.Ed.2d 111 (1971) (rejecting claim of improper amendment because "the court carefully followed the language of the indictment in charging the jury").

### D. *Sufficiency of the Evidence*

Tormos Vega challenges the sufficiency of the evidence on two grounds. He claims that there was insufficient evidence (1) to show that he induced Serrano to pay the $110,000, and (2) to show that he agreed to enter into a conspiracy.

The standard of review for a sufficiency of the evidence claim is " 'whether, taken as a whole and viewed in the light most favorable to the government, the evidence and all legitimate inferences therefrom would allow a rational trier of fact to find guilt beyond a reasonable doubt.' " *United States v. Molinares Charris*, 822 F.2d 1213, 1218 (1st Cir.1987), *cert. denied*, 493 U.S. 890, 110 S.Ct. 233, 107 L.Ed.2d 185 (1989) (quoting *United States v. Luciano Pacheco*, 794 F.2d 7, 10 (1st Cir.1986)). Tormos Vega has not met this standard with respect to either claim.

■ Assuming, arguendo, that "active inducement" is required by the Hobbs Act, there was sufficient evidence from which the jury could conclude that Tormos Vega had induced a payment from Serrano. The Second Circuit has held that "[p]roof of a request, demand or solicitation, no matter how subtle, will establish wrongful use of public office; proof of a quid pro quo would suffice as would other circumstantial evidence tending to show that the public official induced the benefits." *United States v. O'Grady*, 742 F.2d 682, 691–92 (2d Cir.1984). Tormos Vega argues that Serrano could not be seen as having been induced at all, much less by Tormos Vega, as it was Serrano who initially approached Boscio to propose the transaction. However, this argument ignores that Serrano's proposal to pay $110,000 each from his own commission to Boscio and Tormos Vega came only after Boscio had demanded "how much is in it for me?" A rational jury could conclude from this evidence that Boscio's demand induced Serrano to offer to pay $110,000 each to Boscio and Tormos Vega.

The jury could also infer from Tormos Vega's subsequent conduct that Tormos Vega, despite his lack of direct contact with Serrano, had induced his own payments from Serrano through the agency of Boscio. Although there was no evidence directly linking Tormos Vega to Boscio's original demand, Serrano testified that, before he paid any of the money, Boscio told him that "the mayor wants his money now. He wants it now and he needs to see it." Of course, Boscio could have been lying about the mayor's wishes in order to increase his bargaining power, but there was a good deal of other evidence linking Tormos Vega to the transaction. Serrano testified that Tormos Vega met with him and Boscio in Florida to cover up the transaction, and there was testimony linking Tormos Vega to the 110 money orders given to Boscio and showing that fictitious names had been used to cash them. This evidence tended to reinforce the conclusion that Boscio did in fact speak for Tormos Vega when he told Serrano "the mayor wants his money now." Moreover, the evidence showed that Tormos Vega had at one point put a halt to the PMDA's purchase of Shearson's financial products by revoking his approval of the transaction, and that the transaction was finalized only after Tormos Vega signed an agreement with Shearson. The jury could have concluded from this evidence that Tormos Vega's approval was necessary to the transaction, making it more likely that it was his authority, as well as Boscio's, that induced the payments from Serrano. We think that a rational jury could have concluded from this evidence that Tormos Vega had induced Serrano to pay him $110,000.

■ There was also sufficient evidence to support a conviction on the conspiracy count. Tormos Vega argues that there was no evidence of any agreement between him and Boscio or Serrano. *See United States v. Rivera–Santiago*, 872 F.2d 1073, 1079 (1st Cir.1989) ("[t]he sine qua non of a conspiracy is the agreement between the conspirators"). In support of this claim Tormos Vega reiterates his arguments relating to the evidence of inducement, and points to his absence from a critical meeting (at the Condado Holiday Inn to sign various letters) and the fact that he at one point revoked his authorization of the

transaction. However, Tormos Vega's arguments ignore that "[b]ecause of the secretive nature of the crime, it is recognized that the agreement may be express or tacit. . . . [and] may be proven by circumstantial as well as express evidence." *Id.* See *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942) ("a common purpose and plan may be inferred from a development and collocation of circumstances"). We think there was ample evidence from which the jury could have concluded that Tormos Vega agreed with Boscio to extort money from Serrano. Again, that evidence included Boscio's statement that "the Mayor wants his money now" and the evidence that Tormos Vega received the money orders via Boscio. Most importantly, the jury could reasonably have inferred that, as the parties agreed to meet in Florida to cover up the transaction, they had originally agreed to carry out the transaction in the first place.

### E. *Double Jeopardy*

■ Boscio argued in the district court that this prosecution placed him twice in jeopardy for the same offense. The district court rejected this argument, and we affirmed in an interlocutory appeal. *United States v. Boscio,* 843 F.2d 1384 (1st Cir.1988) (unpublished opinion). Since that appeal, the Supreme Court has decided a double jeopardy case, *Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), which, Boscio argues, requires that we reverse our prior decision. Although *Corbin* does govern this appeal, *see Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (rules of law announced while a case is pending on direct review apply retroactively to that case), we do not think it changes the result.

Before this trial began, Boscio was charged with mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, and aiding and abetting others in the same offenses in violation of 18 U.S.C. § 2. We summarized the allegations of that indictment in Boscio's earlier appeal.

Serrano (as Shearson) promised to lend the [PMDA] $3 million dollars [sic]. The [PMDA] would put up $3 million in

"FHA" mortgages and "Title One" notes as security. Serrano had the [PMDA] promise to lend Ponce Developers [a corporation controlled by Serrano] $3 million. Ponce Developers would put up $3 million in the same "FHA" mortgages and "Title One" notes as security. Serrano had Ponce Developers promise to give $2 million to [Home Federal]. [Home Federal] would give Ponce Developers $1.7 million in the same mortgages and notes.

The indictment goes on to say that all this was worked out in May 1982. At that time, Shearson actually provided the $3 million. Serrano had Shearson put $2 million in a [PMDA] account and $1 million in a Ponce Developers account. Serrano then falsely told [Home Federal] that the $2 million in the [PMDA] account belonged to Ponce Developers; and, on the strength of this lie, [Home Federal] gave Ponce Developers the $1.7 million worth of Federal Housing Act notes and mortgages. Serrano used them as part of the collateral for the Shearson loan to the [PMDA].

The indictment concludes by saying that Serrano sent $3 million through the wires to New York . . . [and that Boscio] helped Serrano throughout.

*Boscio* slip op. at 3. Boscio was convicted of the offense alleged in that indictment.

We noted in Boscio's previous appeal that the only "common features" of the transactions giving rise to the fraud and extortion prosecutions were that "the government introduced evidence of the extortion at the appellant's trial for fraud," and "some of the money used to make the extortion payments came from the $1 million [PMDA] account at Shearson set up as part of the fraud." *Id.* at 4–5. We rejected Boscio's double jeopardy claim because "[t]he conduct allegedly leading up to the extortion is . . . sufficiently different from the conduct making up the fraud so that this evidentiary overlap would not come close to making a double jeopardy claim." *Id.* at 5.

At the extortion trial, which took place after our decision in the previous appeal, Serrano testified about the earlier $3 million transaction. Serrano stated briefly that it and other earlier transactions had been "lump[ed] ... together" with a $47 million transaction to make a total $66 million transaction. When counsel for Tormos Vega sought to cross-examine Serrano concerning this transaction, the district court specifically forbade Serrano to "mention Mr. Boscio at all in any way as having been indicted or convicted in relation to any previous transaction...."

Neither *Grady* nor Serrano's testimony at trial change our previous decision. To be sure, *Grady* did expand the reach of the double jeopardy clause, holding that it "bars a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted." 110 S.Ct. at 2087. However, the existence of the earlier transaction was not "an essential element" of the extortion offense. Instead, the purpose of the introduction of evidence of that transaction at the extortion trial was merely to provide background information. That evidence merely filled in a gap in the evidence so that the jury could understand how the $66 million transaction came to involve $66 million instead of only $47 million. The essential elements of the extortion were that Boscio induced Serrano to pay money in order to get his and Tormos Vega's approval for the transaction; why that transaction was for $66 million was not essential to the conviction. Boscio has pointed out only an "evidentiary overlap" which does not constitute a double jeopardy violation. *See id.*, 110 S.Ct. at 2093 ("the presentation of specific evidence at one trial does not forever prevent the government from introducing that same evidence in a subsequent proceeding").

We have considered the other arguments raised by the defendants and find them to be without merit.

For the reasons stated above, the convictions in numbers 88–2235, 89–1253 and 89–2022 are *affirmed*.